The **MACKE COMPANY**

v.

The **UNITED STATES.**

No. 420–70.

United States Court of Claims.

Oct. 13, 1972.

Loren K. Olson, Washington, D. C., attorney of record for plaintiff. Nelson L. Bain, Morgan, Lewis, & Bockius, Washington, D. C., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION, FOR SUMMARY JUDGMENT

DAVIS, Judge:

This is a dispute arising out of a 1964 contract with the Exchange Council, a non-appropriated fund activity of the Kennedy Space Center (of the National Aeronautics and Space Administration), under which the plaintiff Macke Company obtained the right to supply extensive and exclusive food services for employees (and others) at that location. This concession-type arrangement did not require the Council to pay Macke; rather, the latter agreed to perform in the expectation of making a profit and promised to pay the Council approximately five percent of the total receipts from its operations at the Center. However, the venture did not prove profitable (as the parties had anticipated) and in this suit plaintiff claims recoupment of losses, price relief, or other adjustments, from June 1965 until the termination of the contract in the spring of 1967.[1]

The gist of the complaint is that, when it became clear that the contractor continued to suffer unreasonable losses not of its own making, the Exchange Council failed to allow cafeteria and food prices to be raised, or to make sufficient reduction in the payments to be made by Macke to the NASA Council, so as to wipe out or alleviate these losses. For the period through June 1965, an adjustment along these lines, satisfactory to plaintiff, was made, but no similar agreement could be reached for the later time. Plaintiff then made the controversy an issue under the "all disputes" clause of the contract, the contracting officer decided adversely, and the agency's Board of Contract Appeals upheld that determination (in the main), with

1. This court has jurisdiction under 28 U.S.C. § 1491, as amended by Pub.L.No. 91-350, 84 Stat. 449 (1970) (for the purpose of § 1491, "an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States").

one member dissenting. The board ruled that plaintiff should be paid for losses stemming from the Government's actual fault, but not for those unexpected losses intrinsic to the operation. 67–1 BCA ¶6156 (1967), motion for reconsideration denied, 68–1 BCA ¶7041 (1968). The case is before us, through cross-motions for summary judgment, on that decision and the administrative record.

## I.

■ The questions are largely legal, as the parties recognized when they stipulated the issues before the Board.[2] The primary one is whether the contractor was entitled to be compensated for losses which turned out to be inherent in the provision of food service at the unique Kennedy Center under the special system established by the contract. In this inquiry, the greatest help comes, not from the bare text of the original contract, but from external indications of the parties' joint understanding, contemporaneously and later, of what the contract imported. The case is an excellent specimen of the truism that how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself. We are, of course, entirely justified in relying on this material to discover the parties' underlying intention. *See, e. g.,*

Topliff v. Topliff, 122 U.S. 121, 131, 7 S.Ct. 1057, 30 L.Ed. 1110 (1887); Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct.Cl. 21, 30 (1971); Franklin Co. v. United States, 381 F.2d 416, 418, 180 Ct.Cl. 666, 670 (1967); Williamsburg Drapery Co. v. United States, 369 F.2d 729, 735, 177 Ct.Cl. 776, 786 (1966); Universal Match Corp. v. United States, 161 Ct.Cl. 418, 422 n. 4 (1963).

As initially framed, the contract did not deal directly with the problem of whether Macke was to bear the full risk of unreasonable losses inherent in this special undertaking at an exceptional installation. There was nothing explicit on that point in the contract form. But the terms of the agreement did make clear that food prices were not irrevocably fixed as of the time the pact was entered into, and also that there was to be a continuing relationship between prices and plaintiff's operating costs.

The fixing of prices, portions, and quality was to be controlled by the contracting officer, a member of the Exchange Council. Paragraph 3 says that prices charged, equipment used, and all other phases of the operation should be subject to his review and approval.[3] Paragraph 9c requires the contractor to submit monthly reports to the contracting officer "as to costs of operation which may affect the maintaining of sales price at a satisfactory level." An-

---

2. These stipulations were as follows:

*Stipulation No. 1:* "The parties, on this 7th day of September, 1966, hereby stipulate that one of the issues to be determined by the Board of Contract Appeals in the above-captioned matter is whether Appellant [plaintiff] is entitled to recoupment of any losses suffered in the performance of its food services contract since June 30, 1965 pursuant to numbered paragraphs 8 and 9(c) of Additional Provisions of the contract and by Contracting Officer's letter dated January 16, 1964 as amplified by Modification No. 4 to the contract dated December 7, 1965; and that, in the event the above issue is determined in the affirmative by the Board, the question of amount of and criteria for recoupment shall be

remanded to the parties for negotiation and resolution."

*Stipulation No. 2:* "The parties, on this 7th day of September, 1966, hereby stipulate that one of the issues to be determined by the Board of Contract Appeals in the above-captioned matter is whether Appellant [plaintiff] is entitled to additional price and other equitable relief sufficient to place Appellant in a position to make a reasonable or normal profit under the contract without further consideration. If the Board decides this issue affirmatively, the matter shall be remanded to the Contracting Officer for determination of the amount and form of relief to be afforded."

3. See the appendix *infra* for the full text of the relevant parts of the contract.

other provision, 8, remits approval of sales prices to the contracting officer, directing his exercise of this power by the guidelines of operating costs, on the one hand, and prevailing area prices on the other: "Although sales prices should be reasonable in relation to prevailing prices for similar service in the surrounding area, which shall be approved by the Contracting Officer and shall in no case exceed prevailing area prices, due consideration shall be given to prospective operating costs." This provision was amplified by the contracting officer's letter transmitting the signed contract in January 1964, admitted on both sides to be an integral part of the contract, which said that "Paragraph 8 * * * provides for change in food prices as may be required by operational costs or other conditions" and "prices, portions, and variety are subject to the approval of the Contracting Officer."

■ One permissible explication of these somewhat amorphous and open-ended provisions is that the agency would be sensitive to the contractor's need for adjustments to allow it to make a profit and avoid a loss. The pre-bid conference, attended generally by potential bidders, expressed exactly this understanding. Defendant's authorized representative told those at the meeting that "You are expected to make a profit," and promised that the contractor could negotiate with the contracting officer were no profit realized. As we have recently emphasized, such official statements can and should be taken into account in ascertaining the parties' joint understanding. *See* Manloading & Management Associates, Inc. v. United States, 461 F.2d 1299, 198 Ct.Cl. —— (1972); Sylvania Elec. Products, Inc. v. United States, 458 F.2d 994, 1008, 198 Ct.Cl. —— (1972).

Apparently Macke, when it became the contractor at the beginning of 1964, expected a loss of some $55,000 for its first year, but it was anticipated that a profit would be realized overall during the life of the contract. However, disappointment soon succeeded hopeful anticipation. In the middle of July 1965, after a year-and-a-half of performance, plaintiff wrote the contracting officer complaining that its losses through June 1965 exceeded $117,000, much more than the $55,000 loss foreseen for the first year. Its request for relief included a report of operating costs and a projection of profit as of September 1965.

After confirmation of these expenses and losses through June 1965, the parties negotiated Modification #4, which reduced the commissions the plaintiff was required to pay the Exchange Council from 5.1% downward to 2.1%, until such time as $60,000 of losses had been recouped. Modification #4 contained the following recital in explanation of the parties' supplemental agreement:

> Whereas the parties hereto by numbered paragraphs 8 and 9c of Additional Provisions of the Contract and by Contracting Officer's letter dated January 16, 1964, contemplated and provided a relationship between operational requirements and prices to permit a profit to the Contractor and payment of commissions to the Council, and whereas the parties further understood and agreed that some losses would be incurred by the Contractor initially but that any unreasonable losses flowing from operational requirements and other conditions would be recouped under the contract, and whereas the parties have now agreed that the Contractor has suffered unreasonable losses and that the unreasonable portion of the losses should be recouped.

This Modification #4, in our view, clearly exposed and confirmed what the parties' actual understanding had been from the beginning—first, "that any unreasonable losses flowing from operational requirements and other conditions would be recouped under the contract," and, second, that the contract "contemplated a relationship between operational requirements and prices to permit a profit to the Contractor and payment of commissions to the Council." At the

same time, the supplemental agreement definitively determined that, through June 1965, Macke had in fact suffered such unreasonable losses, not its fault or responsibility, which were to be recognized and recouped. The compensated losses were due to factors for which the Government was directly responsible and also to expense-inducing elements inherent in the project, for which neither party bore responsibility—such things as slippage in construction through bad weather and strikes, training of an unskilled labor force, and placing of vending machines at locations with insufficient volume.

That Modification #4 reflected the format of the actual joint agreement, as originally made, is shown, conclusively we think, by elaborate written comments of the Exchange Council urging (over the opposition of others) the Director of the Space Center to approve the Modification. The Council's first paper [4] observed that "[t]he parties realized that some losses would be experienced initially due to overall facility availability schedule including slippage and operational requirements not originally known and not yet subject to determination with certainty as to exact scope or detail[,]" and then went on:

> The parties at time of contract execution and since have contemplated and understood that at a subsequent date when past, current and, to a degree, future loss potential were determined and could be effectively related to continuing operational requirements, an equitable adjustment would be made

to offset the unreasonable losses incurred by Macke as a result of factors not completely within the previously existing knowledge or control of the parties. Operational service requirements, not initially determined, contemplated or foreseen by the parties have been required by the Council in the exercise of its broad right to dictate changing/expanding requirements. The effect of compliance therewith coupled with prices permitted to be charged has resulted in an operational loss to Macke in excess of $117,000 during the past two years of operations. * * *

The subsequent memorandum repeated that "prices are related to (and governed by) operational costs thus providing for an operation (profitable to both the Contractor and the Council) during the term of the contract." Confirming that the contractor had been requested by the contracting officer not to submit price increase requests, the document pointed out that since all the parties intended from the inception of the contract,[5] "a profitable operation under the Contract within a reasonable price structure considering operating costs," continued failure to make monetary adjustment would "be considered by * * * contract authorities as a breach of contract by the Council." Losses were attributed not to plaintiff's inefficiencies but were "directly related to Council failure to permit increased prices in relation to operating cost." "The contract here however was not in any sense of the word 'a fixed price con-

4. There were two memoranda. The first was dated August 10, 1965, the second October 26, 1965. Both were from the Chairman of the Council, but each was also signed by every Council member individually, including the then contracting officer (who was a member of the Council). Modification # 4 was not officially approved by the Director of the Center until the latter half of November 1965.

5. The Council stated: "The keynote of the entire preproposal conference was that regardless of who the successful offerer was, he was not expected to operate at

a loss. This was not only a matter of direct statement but by implication throughout the Conference. This was also emphasized in the Council's oral presentation to Center Management prior to award of contract"; and also "Provisions for price adjustment in relation to operating costs during the periods of performance were included in the RFP, understood by all interested sources during the Preproposal Conference, explained to Management during the Council presentation leading to award and included in the contract as awarded."

tract' with the risk of loss on the Contractor for arbitrary action or failure of the Council to give effect to a specific contract provision expressly providing for price change related to operating costs." "The question is should the Contractor be reimbursed for the unreasonable portion of unusual losses incurred over a period of two years through no fault of his own. The answer to this question is 'yes' for reasons stated."

■ These formal statements [6] of the Exchange Council, the Government's contracting party, as to what occurred prior to award, together with the Council's view of the joint understanding, stand unrefuted on the record. Along with the other materials which we have mentioned—the terms of the original contract, the pre-bid conference, the recitals and contents of modification #4[7]—they demonstrate that the contractor was not expected to bear the risk of unreasonable losses due to difficulties inherent in the food operations at the Space Center. Unlike the normal fixed-price contractor who shoulders the responsibility for unexpected losses, as well as for his failure to appreciate the problems of the undertaking, this plaintiff had the right to expect relief from the Government if things went awry without fault. The unusual circumstances at the Space Center obviously led to this special and unique arrangement.

It is immaterial whether we formulate this conclusion as an interpretation of the existing written contract or as a ref-

ormation of the written agreement to reflect the parties' actual understanding.[8] On either basis we must accept Macke's contractual right of compensation for unreasonable losses as extending beyond those caused directly by the Government. In ruling otherwise, the majority of the Board of Contract Appeals erred as a matter of law.

## II.

We are told, however, that, in any case, plaintiff cannot prevail because the only contractual method of relief from such losses was through a rise in food prices which could not exceed the level prevailing in the area—and that plaintiff has not shown under that standard that food prices could have been increased at the Center.

■ Modification #4 and its history prove that a price increase was not the sole and exclusive method of adjustment. That supplemental agreement, expressly made for recoupment of such unreasonable losses, was accomplished, not via a price rise, but through a substantial reduction in the concession payments by Macke to the Exchange Council. The Council's two written recommendations for the adoption of this Modification— to which we have already referred— make it clear that this adjustment was in lieu of a price increase (direct, or concealed through decrease in portions or services) which the agency was unwilling to permit. The first memorandum said: "Reduced service requirements to preclude the incurrence of or price increases to offset such losses [i. e., the $117,000 loss suffered by plain-

---

6. Antedating the eruption of the later controversy between plaintiff and the Council.

7. It is also worthwhile to note that Macke was, on other occasions, allowed to reduce services (in order to avoid further loss) without giving consideration to the Government (discontinuance of executive dining-room service; permission to charge for rolls-and-butter; discontinuance of mobile center service).

8. *Cf.* Jamsar, Inc. v. United States, 442 F.2d 930, 932, 194 Ct.Cl. 819, 823

(1971); Bromion, Inc. v. United States, 411 F.2d 1020, 1022–1023, 188 Ct.Cl. 31, 35–36 (1969); Chernick v. United States, 372 F.2d 492, 496–497, 178 Ct.Cl. 498, 506 (1967); Gibbs v. United States, 358 F.2d 972, 980, 175 Ct.Cl. 411, 426 (1966); Panama Power & Light Co. v. United States, 278 F.2d 939, 150 Ct.Cl. 290 (1960); Jones & Sears, Inc. v. United States, 158 Ct.Cl. 162, 172 (1962), 3 A. Corbin Contracts §§ 540, 614 (1960).

tiff through June 1965] were not possible. Such actions were not acceptable to prevent subject losses and likewise are not now acceptable as a basis for equitable adjustment currently required. Consequently, the equitable adjustment negotiated and agreed upon is founded in other considerations * * *." The second, more extensive, memorandum repeats several times that management would not countenance a price increase, and therefore that the other method of loss-recoupment was being adopted.[9] This contemporaneous, specific, practical interpretation carries the day over efforts at lace-work exegesis drawing on the thin words of the original contract, separated from their implementation during performance. The parties' practice, embodied in a formal amendment to the contract, has established that one acceptable remedy for unreasonable contractor losses would be a reduction in the commissions payable to the Exchange Council. It is natural that this type of relief would be used; if the contractor suffered a loss not through its fault, the Government could be expected to waive all or part of its own profit in order to diminish or obviate the other side's loss. The contract documentation, including the original text, shows that the parties consistently viewed the profits of the two sides as on a par, so that, if Macke had a loss instead of a profit, it would then be reasonable for the Government to forego its gain.

### III.

The board, especially in its opinion on reconsideration, seems to assume that the Government may have failed in its obligation to consider price increases, but nevertheless shuts plaintiff out because, it says, customer resistance would have prevented Macke from reducing its losses even if it had been permitted the 20% rise it sought for the period after June 1965. We by-pass plaintiff's insistent objection that this factual finding, related to the amount of possible recovery, was beyond the liability issues stipulated as before the board (*see* note 2, *supra*) because we are satisfied that, on the whole record, there is in any event no substantial support for the finding.

The documentary evidence for plaintiff is strong; the Exchange Council's two memoranda, from which we have quoted, say flatly that the losses through June 1965 were caused by the Government's failure to permit price rises. Those admissions, made before the dispute arose, are persuasive that the same is true for the following period.

The administrative finding to the contrary rests solely on a statement in a letter by Macke's senior vice-president

9. " * * * From inception of the contracts the continuing admonition of top management to the Council has been that price increases or reduced services requirements were not acceptable to prevent or offset losses being incurred by the Contractor and that while the Contractor was expected to make a profit action to correct the situation, when taken, should be on some other basis equitable to the Contractor and the Council. This admonition was given to the Council on a continuing basis and the Contractor was requested by the Contracting Officer not to submit price increase requests and to delay submitting any request for equitable adjustment on any other basis until requested."

" * * * The price increases contemplated for have not been effected due to Management's position/reasons stated above. * * * The Council has been admonished by Management to accomplish an equitable adjustment on a basis other than price increase or reduction in support requirements."

" * * * price increases or reduction of service requirements were not acceptable to prevent the losses and not acceptable to prevent their occurrence in the future and that equitable adjustment would have to be based on other grounds. This was and has continued to be Management's position and admonition to the Council and the Contracting Officer's continuing position with the Contractor."

" * * * The problem developed and still exists due to the fact that such provision ['provisions for price adjustment in relation to operating costs'] was denied application thus causing a continuing loss situation to develop as previously noted."

(dated October 25, 1965, after the negotiation of Modification #4) that "it was not feasible to prevent the losses by increasing prices". In context,[10] this remark was not a concession that price increases would cause losses, but instead a simple recognition that top management at the Center would not countenance a price increase—or at most an agreement that morale would probably suffer from higher prices and smaller portions, so that, at the time of Modification #4, the more tolerable route to recoupment of the $60,000 in losses was to cut commissions to the Council rather than to antagonize the employees or to reduce necessary services.

This reading comports fully with Macke's continuous and vigorous effort to secure various kinds of relief, including a price adjustment.[11] Indeed, only a day after the senior vice-president's letter, the Council issued its second memorandum, exposing both its failure to discuss the price increases Macke sought and its admission that the firm lid on prices, imposed by management, had seriously contributed to plaintiff's losses.

The record before the Board suggests that the oral testimony most directly in point is that of the then Chairman of the Council (Mr. Roten), who stated directly that losses resulted from low food prices. The board may not have credited Mr. Roten, but if so it had no other evidence on which it could reasonably rely. Although there was extensive testimony by Government witnesses as to complaints by the employees about the prices and the service, and thus as to the undesirability from the point of view of morale of charging more, there was no assertion that a price rise, however unpopular, would not have helped reduce losses. No evidence was introduced as to the alternatives available to disgruntled employees (e. g., the chance to patronize other cafeterias or restaurants, or the practice of "brown bagging"). It may be that customer resistance to higher prices would have induced a grave boycott and increased Macke's losses still further, but there was absolutely no evidence to that effect. Accordingly, we find no evidence in the existing record to support the board's conclusion that a price increase would not have helped plaintiff.[12]

IV.

We still have to grapple with the separate problem of whether an adjustment-for-losses (after June 1965) was nevertheless barred because the established food prices were already at the level of prevailing rates in the area, and therefore could not be substantially raised under the contract, no matter what plaintiff's difficulties. Defendant maintains that, for the period after June 1965, the only rise which could be allowed was 5% (which the agency offered) and not 20% (as plaintiff demanded).

---

10. "In August we met with the Exchange Council and discussed the unreasonable losses we had suffered in our efforts to meet NASA's changing and expanding food and vending service requirements. We agreed with the Council that it was not feasible to prevent the losses by increasing prices, decreasing portion sizes or reducing services. We then entered into an agreement with the Council to put a ceiling on our profits in return for the Council's agreement to reimburse us for the unreasonable losses which we suffered in operating the food and vending service amounting to $60,000."

11. In interpreting the "not feasible" sentence as it did, the Board admitted that it did not comprehend why Macke would

have taken such a position: "Why appellant agreed to this [the unfeasibility of price increases to cut losses] at this time we do not know." 68–1 BCA ¶ 7041 at 32, 548.

12. The board also seems to have placed upon plaintiff the burden of showing affirmatively that a price increase would have benefited it. We think this was erroneous, particularly in view of the Exchange Council's express admissions, but in any case it is clear that plaintiff sufficiently bore whatever burden could be imposed on it at the stage of determining liability (a stage which did not involve calculation of the amount of recovery).

The first answer is that, as we have gauged the parties' agreement-in-practice, a reduction in the commissions paid to the Council was permissible even though prices could not be increased because they had already attained the maximum level. At least two methods of responding to unreasonable losses were available—raising prices (together with a rollback of services) and reducing Macke's commission payments to the Council. Even if the first alternative could not be used because of the limitation to "prevailing prices for similar service in the surrounding area," the second would still be open.

In Modification #4, without lifting prices, the defendant reduced the payments from 5.1% of all food sales to 2.1% until $60,000 was recouped. There was nothing to prevent the agency from continuing this diminution for a longer period or from reducing the commissions still further—even to the point of abolishing them altogether. The terms of the written contract nowhere tie the commissions to "prevailing area prices," and there was no contractual barrier to use of this independent avenue of loss-relief. Having undertaken to protect plaintiff against unreasonable losses (see Parts I and II, supra), the defendant could have decreased its commissions even if prices were frozen because the stage of "prevailing area prices" had already been reached. As we have indicated, the agency did not restrict its obligation to permit loss-recoupment to the single channel of price raises. The responsibility to compensate for unreasonable losses extended beyond the price provisions of the arrangement. The Government could, as we have pointed out, forego its own profit in order to help the contractor avoid or recoup unreasonable losses.

A second solution to the problem of "prevailing area prices" is to weave that particular part of the contract into the fabric of the agreement as a whole. On its face, paragraph 8 of the original writing points in two different directions: prices are to be increased according to operating costs but prices are also to be stabilized according to prevailing area prices. Both factors must be considered in the light of the whole transaction. On that view, we see the provision as requiring, first, that to the extent that the Government called for services and operations with requirements similar to those which would be normal in other area food establishments, prices would have to be comparable; but, second, to the extent that the Government required uneconomic services or arrangements in view of the obviously unique characteristics of the work at Kennedy Space Center, there would be no "similar service" to which the Government could refer as a standard for setting prices.

In 1964, when this contract was made, the difficulties of operating at the unique installation which is the Kennedy Space Center, as well as many of the loss-inducing services which the Government would require, could not be completely foreseen by either side for lack of any comparable experience. It would be sensible to provide that, if the Government directed the contractor to build a cafeteria, similar in all pertinent requirements to an ordinary local cafeteria, and to serve there the number of people for which the cafeteria was designed during the usual hours, prices should not exceed the area level. However, when the agency directed food services at a remote missile launch in the middle of the night to serve a small number of dignitaries or employees during space shots, or imposed other requirements which a normal food operator would not have to meet, it was ordering a service or creating conditions which, however vital to the Center, would be unprofitable or lead to a loss —and very unlikely to be acceptable to the normal commercial enterprise. Since in that setting there is no similar service, the comparison to area prices is not a meaningful concept. It is true that some of these services were specified in the contract (e. g. V.I.P. cafeteria, Saturday cafeteria service), but nei-

ther party anticipated the extent to which the uneconomical nature of these operations would make losses inevitable, no matter how efficiently the contractor performed.

The parties' situation at the time the agreement was made suggests this reading of paragraph 8 to permit price increases above prevailing rates if conditions are not comparable. This was to be a unique facility without precedent, and the contingencies would be very great. It was practical for the Government to assure the contractor of adequate price levels as a quid pro quo for the latter's agreement to perform additional services, to offer large portions, to do whatever the contracting officer might direct. On the other hand, a prudent contractor would not likely undertake to perform such open-ended requirements without provision for some relief from the clamp of the "prevailing area prices" provision; there was no fee to compensate the contractor if loss-producing services or conditions of operation were required. *Cf.* Franklin Co. v. United States, 381 F.2d 416, 419, 180 Ct.Cl. 666, 672 (1967); Deloro Smelting & Ref. Co. v. United States, 317 F.2d 382, 387, 161 Ct.Cl. 489, 497 (1963). In allowing exceptions to the maximum price provision, the Government would gain flexibility for the new and sprawling Center, where food needs and operating costs could not be accurately detailed in advance and where certain uneconomic services would be demanded for the smooth running of the complex. At the same time, the plaintiff would be given the chance to make a profit by price levels which took into account the unusual location and service requirements.

For each of these separate reasons, we conclude that the "prevailing area prices" restriction does not preclude relief here even if defendant is correct that plaintiff's prices were already as high as the retail food prices in the general locality.

V.

 The last question is whether plaintiff is entitled to any profit, as well as to recoupment of its unreasonable losses. From the statement at the prebid conference (*see* Part I *supra*), the recital in Modification #4 [13] and the Exchange Council's two memoranda to which we have referred [14] it is plain that the parties contemplated a relationship between operating costs and prices (or whatever other relief was necessary) so as to assure plaintiff a profit—were it an efficient, careful manager (and apart from general difficulties facing all food service activities). Although a loss of approximately $55,000 was foreseen by Macke for the first year, a profit was expected to be realized within the lifespan of the contract. Plaintiff was not guaranteed a profit regardless of its own efficiency or of the normal risks incident to all food-service enterprises— but otherwise it was entitled to a fair

13. " * * * Whereas the parties hereto by numbered paragraphs 8 and 9(c) of Additional Provisions of the Contract and by Contracting Officer's letter dated January 16, 1964, contemplated and provided a relationship between operational requirements and prices to permit a profit to the Contractor and payment of commissions to the Council[.]"

14. "The Request for Proposal and the resulting contract for Food Services entered into on 15 January 1964, with Macke provided a relationship between Service requirements, including related operational costs and food prices, and contemplated a profit to the Contractor along with commissions to the Council."

"Moreover, for the record the contract specifically provides for Council control of prices through its Contracting Officer and that prices are related to (and governed by) operational costs thus providing for an operation (profitable to both the Contractor and the Council) during the term of the contract."

The second memorandum also states: "The Contracting Officer, the Exchange Council and Management intended and the Contractor contemplated a profitable operation under the Contract within a reasonable price structure considering operating costs."

profit on its undertaking. In particular, it was not to be disadvantaged by the location, special requirements of, or the unusual operating conditions at the Space Center.

There may seem an apparent inconsistency between the recital in Modification #4,[15] stating that the parties contemplated a profit, and the content of the Modification, which permits only recoupment of losses. The explanation lies, we think, in the events of mid-summer 1965. At the time of Modification #4, Macke told the Government that a break even point was anticipated as of August 1965 and that a profit was projected as of September 1965. The initial draft of Modification #4, which was accompanied by the Council's first memorandum, contained provisions providing for margin of profit ceilings of 8% (in those years in which gross sales were less than $1.5 million) and 7% (in those years in which gross sales were equal to or greater than $1.5 million). In accordance with Macke's projections, those provisions were to become effective as of September 1965. A Council memorandum for the record (dated November 26, 1965) and a letter of the contracting officer (dated December 7, 1965) explain the ultimate deletions of these 7% and 8% profit ceilings:

> You will note also that the provisions for maximum profit ceilings of 8% and 7% respectively have also been deleted. The reason for these deletions is that such could be interpreted as guarantees which as such would exceed the normal 6% profit on food service ventures.

In other words, the parties thought at that time that it was necessary only to reduce the commissions for Macke to recoup the $60,000 of unreasonable losses suffered beyond the $55,000 of expected losses. Macke's figures showed that a profit would be realized by September 1965, well before the expiration of the contract term. The defendant considered a 6% profit customary in food service ventures and plaintiff was expected to earn that amount, beginning in September.

## VI.

Our conclusion is that plaintiff is entitled to recover, for the period after June 1965, not only the losses specified by the Board of Contract Appeals (*i. e.*, those for which the defendant was directly responsible) but also losses inherent in operating at the Kennedy Space Center and beyond plaintiff's control. Losses due to the contractor's ineffiency,[16] other fault within its control, or of the kind that any food service enterprise would incur, are to be excluded. The plaintiff is also entitled to recover a reasonable profit, not in excess of 6%, taking into account the compensable losses as calculated under this standard. The amount of recovery will have to be determined administratively if the parties cannot agree.

Accordingly, the plaintiff's motion for summary judgment on Count I of the petition is granted, and the defendant's is denied (except with respect to Count II), as indicated in this opinion. Pursuant to Rule 167, proceedings in this court are stayed for a period of six months to permit the plaintiff to seek a determination by the National Aeronautics and Space Administration of the amount to which plaintiff is entitled.[17]

15. As we have stressed, the recital to Modification # 4 is but another indication—along with the Council's two memoranda and the pre-bid conference—that it was the parties' understanding at the time of the execution of the contract that Macke would show a profit.

16. There is some testimony in the existing record that plaintiff was inefficient, but the board made no finding. This point should be considered open for further development if either party desires.

17. We do not in this case exercise the authority granted the court by Public Law 92–415, 86 Stat. 652, approved August 29, 1972, because our Rule 167 has not as yet been amended to provide any

Count II of the petition, stating a breach claim, is dismissed as redundant and subsumed in Count I (defendant's cross-motion is granted to that extent).[18]

### APPENDIX

*Contract Provisions Involved*

A. Paragraph 3(a) of Additional Provisions of the contract provides:

Subject to the detailed provisions stated hereinafter, menus, recipes, the quality of food and service, prices charged, the type, quantity, and condition of equipment, and all other phases of operation shall be subject to the review and approval of the Contracting Officer at all times.

B. Paragraph 9(c) of Additional Provisions of the contract provides:

The Contractor shall submit monthly operating reports to the Contracting Officer on Form acceptable to the Contracting Officer, and shall furnish such additional data as the Exchange may require from time to time with respect to commissions and other income derived from operations under the contract. When requested by the Contracting Officer he shall also furnish information as to costs of operation which may affect the maintaining of sales price at a satisfactory level.

C. Paragraph 8 of Additional Provisions of the contract provides:

Before beginning operations under contract, the Contractor shall submit a sales price list to the Contracting Officer for approval. The list shall describe all items proposed to be sold, and shall indicate the portion size of each item. Similar action shall be taken when additional items are added to the sales list. Although sales prices should be reasonable in relation to prevailing prices for similar service in the surrounding area, which shall be approved by the Contracting Officer and shall in no case exceed prevailing area prices, due consideration

shall be given to prospective operating costs. Sales prices for individual items shall be prominently displayed at the locations where such items are sold.

relief other than suspension in Wunderlich Act cases.

18. Hoel-Steffen Constr. Co. v. United States, 456 F.2d 760, 768, 197 Ct.Cl. 561, 574 (1972).