Per Curiam :
These cases come before the court on plaintiffs’ request, filed April 19, 1976, for review by the court of the recommended decision of Trial Judge Thomas J. Lydon, filed February 24, 1976, pursuant to Pule 166(c) on defendant’s motion and plaintiffs’ cross-motion for summary judgment and on defendant’s motion, filed May 14, 1976, requesting the court to adopt the said recommended decision. Upon consideration thereof, together with the opposition thereto and the briefs and oral argument of counsel, since the court agrees* with the trial judge’s recommended decision, as hereinafter set forth, it hereby denies plaintiffs’ request for review, grants defendant’s motion to adopt and adopts and affirms the decision as the basis for its judgment in this case. Therefore, plaintiffs’ cross-motion for summary judgment is denied, defendant’s motion for summary judgment is granted and the petitions are dismissed.
OPINION OP TRIAL JUDGE
Lydon, Trial Judge:
These ten cases have been consolidated for decision since they involve similar factual situations and present an identical legal question for determination. While the pleadings, motions and briefs of the parties raise a number of issues and advance a variety of arguments, analysis indicates that the basic dispositive issue, central to all ten cases, concerns the legal interpretation to be given the so- *55 called payment provision clauses contained in the construction contracts awarded the ten plaintiffs, South Vietnamese contractors, by defendant, acting through the Department of the Navy.[1]
The ten contracts in issue provided for the “Construction of Force Structure Increases,” and involved the construction in the Republic of South Vietnam of a hospital, sewers, latrines, billets, etc. All the contracts were negotiated firm fixed price, or lump sum, contracts. The bid proposals submitted by the plaintiffs were stated in Vietnamese currency, i.e., piasters. However, the formal contracts, as initially awarded plaintiffs, stated the contract prices in United States currency i.e., dollars.[2] In three instances (Ct. Cl. Nos. 455-72, 457-72 and 461-72), contracts were subsequently modified and amended so as to state the contract prices in piasters instead of dollars. There is no explanation in the records for these modifications, which took place in August and September 1968, and no conclusion can be, or is, drawn relative thereto. It is established that all contract payments made to the plaintiffs wore in piasters. This was accomplished by defendant converting dollars into piasters, utilizing an exchange rate of 80 piasters for each dollar (hereinafter 80 tol).
Before the Armed Services Board of Contract Appeals (hereinafter the Board), plaintiffs claimed entitlement to additional compensation relative to the contracts they performed on the basis that the amounts paid them in piasters should have been calculated at a conversion rate of 118 piasters to the dollar (hereinafter 118 to 1) instead of at the *56 rate of 80 to 1.[3] The Board denied plaintiffs’ claims by decision dated October 27,1971 (71-2 BCA ¶9149), and affirmed this decision, on plaintiffs’ motion for reconsideration, on August 3, 1972. The plaintiffs thereafter filed ten separate petitions in this court challenging the Board’s determinations.
The parties were proceeding under Buie 163(b), each having filed motions for summary judgment when said proceedings were interrupted on October 25, 1974, and subsequently suspended on March 6, 1975, in order to allow the parties time to resolve a possible conflict of interest which had surfaced involving the propriety of then counsel of record continuing to represent plaintiffs in the litigations. On April 22, 1975, notification was received that said counsel of record for plaintiffs was withdrawing from the litigations. The suspension order was lifted on April 25,1975.
On June 27,1975, James M. O’Neill filed a motion, under Buie 203 (c), to be substituted as counsel of record for plaintiffs. ,In an affidavit which accompanied this motion, counsel advised that the prior attorneys of record for plaintiffs “have on behalf of plaintiffs requested him to take over all representational work in behalf of plaintiffs and to become counsel of record in all these cases.” On or about April 30,1975, the Government of the Bepublic of South Vietnam fell to communist forces. Counsel was unable to locate and/or contact nine of the ten plaintiffs involved herein. Counsel was able to locate in the Washington, D.C., metropolitan area one Dao Van Quang, the owner and principal officer, of Vanaco, plaintiff in Ct. Cl. No. 461-72, who ratified and approved the substitution of James M. O’Neill as attorney of record for Vanaco by affidavit dated August 4, 1975. In this affidavit, Dao Van Quang stated that for 2 years prior to his departure *57 from Vietnam be was in frequent contact witb tbe other plaintiffs, had acted as spokesman for the entire group of contractors and voiced his personal knowledge and belief that at the time he departed Vietnam all plaintiffs intended to proceed with the litigations.[4]
Subsequent to August 4, 1975, the parties filed their concluding briefs thereby presenting the cases for decision.[5]
I
All of the contracts here in issue were awarded during the period December 29, 1966, and August 28, 1967, and ranged in amounts from $21,171 to $249,306.75.[6] The contracts were entered into on defendant’s behalf by four different contracting officers. The original completion dates contemplated in the contracts varied from about 2y2 months to 5 months from date of notice to proceed or commencement dates. The commencement dates did not vary significantly from the award dates. While all of the contracts were awarded on or before *58 August 29, 1967, only three contracts (i.e., those involved in Ct. Cl. Nos. 455-72, 457-72 and 461-72) were originally scheduled to be completed after October 1, 1967. However, actual work completion dates, as distinguished from dates when final payments were received, were from 4 months to as much as 13 months after the commencement dates. It is difficult to ascertain from the records the actual work completion dates of each contract but it is safe to say that most of the contracts were completed after October 1, 1967. It is clear that final payments on all the contracts were received after October 1,1967. The significance of the October 1,1967, date will appear hereafter.
It is important to bear in mind that plaintiffs’ bid proposals were submitted in piasters. The final formal contract between the parties stated the contract price in dollars. The dollar amounts were arrived at by converting the piaster figures set out in plaintiffs’ accepted proposals at the exchange rate of 80 to 1. The final formal contracts were executed by the parties and clearly manifest their intent that the rate of exchange utilized by them in formulating the contracts was 80 to 1.
Nine of the ten contracts here in question contained the following clause:
The consideration under this contract in the lump sum amount of [stated contract price in dollars] is expressed in TT.S. Dollars; however the United States Government ■reserves the right to make payments in Vietnamese Piastres at the legal rate of exchange between the Ü.S. Dollars and, Yietnam%ese Piastres in effect on the date approved invoices are presented to Finance Officer for payment. [Emphasis added.]
The clause in the remaining case (Ct. Cl. No. 453-72) is identical to that quoted above up to and including the word “exchange,” after which it concludes as follows:
* * * between the two currencies in effect at the time any invoice is presented for payment. [Emphasis added.]
It is the above clauses, especially the underscored portion, on which the decision in these cases must rest. The parties do not attach any significance to the different wording of the two clauses, supra, and such language differences as exist can *59 rightly be considered immaterial. The Board observed that neither party offered evidence to show any discussion during negotiation of the contracts concerning the reason for including the above clauses in the contracts, nor was any evidence offered as to why the contract prices were stated in dollars rather than piasters. There was no testimony submitted to the Board nor any Board hearing in the adversary sense. The Board rendered its decision on a record composed only of documents. See Blanchard v. United States, 171 Ct. Cl. 559, 567, 347 F. 2d 268, 273 (1965).
The Board utilized excerpts from the Eighteenth and Nineteenth Annual Reports on Exchange Restrictions, 1967 and 1968, published by the International Monetary Fund, which excerpts were before the Board on stipulation of the parties, to establish the exchange rate system prevailing in South Vietnam during the period the contracts in question were negotiated and executed by the parties and thereafter. In substance, the official rate of exchange prevailing at the time the contracts were negotiated and executed was 80 to 1. Parenthetically, this was also the rate at which the United States was authorized by the Government of the Republic of South Vietnam to buy piasters in South Vietnam. There also existed another rate of exchange called a “Consolidation Premium” or a “Consolidation Tax,” which consisted of a subsidy of 38 piasters to the official rate of exchange of 80 piasters to produce a rate of exchange of 118 to 1. This subsidy, which was made available to selected entities by the Government of South Vietnam, enabled those entities to purchase piasters in South Vietnam at the exchange rate of 118 to 1. The United States Government was not one of the entities to which the 38-piaster subsidy was made available at the time the contracts in question were negotiated and executed. Both these rates of exchange were provided for by Republic of Vietnam Decree Law No. 001/SLU and Decree Law No. 002/SLU issued June 18, 1966. In essence, both exchange rates can be considered legal rates since both were promulgated by the Government of South Vietnam. There also existed in South Vietnam at the time the contracts were negotiated and executed an illegal free exchange market rate (black market rate of exchange) which was in excess of 118 to 1. It seems clear that very few, if any, private transactions *60 took place at the rate of 80 to 1 and. that the exchange rate of 118 to 1 was the rate at which most transactions occurred. This, in essence, was the exchange rate situation that prevailed in South Vietnam when the contracts were negotiated and executed.
It is not unreasonable to charge both defendant and plaintiffs with knowledge of the exchange rate system prevailing in South Vietnam at the time the contracts in question were negotiated and executed. Further, it seems reasonable to conclude that utilization by the parties of the exchange rate of 80 to 1 in negotiating and executing the contracts manifested an understanding that the language in the payment clauses, “legal rate of exchange,” was synonymous with the “official rate of exchange” language in the Republic of Vietnam Decree Laws and the above-referenced International Monetary Fund Reports. This conclusion is reinforced when it is noted that two legal rates of exchange were in existence when the parties entered into the contracts in question. The selection by the parties of one of two existing legal rates of exchange pinpoints rather clearly the legal rate of exchange they agreed to abide by.[7]
Plaintiffs submitted vouchers and/or invoices for payment in connection with performances of their contracts. Some vouchers were presented in piaster amounts and others were submitted in dollar amounts. There is nothing in the Board records to indicate why some vouchers were submitted in piasters while others were submitted in dollars. With reference to those vouchers presented in piasters, plaintiffs were paid the requested amounts (assuming arithmetical accuracy) . If a voucher was presented in a dollar amount, that amount was converted into piasters by utilization of an exchange rate of 80 to 1, and the contractor was paid, in piasters, the product of that multiplication. In either case, defendant’s approving official, a finance or fiscal officer, generally showed on the payment voucher the amount approved *61 both, in dollars and piasters as well as the exchange rate at which the conversion was computed. In the “Accounting Classification” section of the vouchers, in addition to appropriate budgetary and accounting information, the dollar amount only was shown. As a result, before October 1,1967, when a conversion was accomplished in processing payment vouchers received from plaintiffs at the exchange rate of 80 to 1, that exchange rate was also the basis for determining the amount expended from defendant’s contracting agency appropriation account.
The harmonious conduct of the plaintiffs, relative to contract billings and acceptance of contract payments by them prior to October 1,1967, persuades that prior to said date all parties concerned considered the legal rate of exchange, as that language was used in the contracts, to be 80 to 1. See Cresswell v. United States, 146 Ct. Cl. 119, 126, 173 F. Supp. 805 (1959). Further the conduct of the parties and attendant circumstances prior to October 1, 1967, provide some insight into the parties’ underlying intention relative to the meaning to be given the clauses in question. Macke Co. v. United States, 199 Ct. Cl. 552, 556, 467 F. 2d 1323, 1325 (1972).
By Republic of Vietnam Decree Law No. 035/SLTJ issued August 29, 1967, effective on and after October 1,1967, the South Vietnamese Government extended the “Consolidation Premium,” or subsidy of 38 piasters, mentioned previously, to all financial and commercial transactions from abroad to South Vietnam. As a result, effective October 1, 1967, the United States Government became eligible to purchase piasters at the exchange rate of 118 to 1. It is the issuance of this Decree Law which set in motion the present litigations.
Plaintiffs assert that as of October i, 1967, the “effective legal rate” of exchange changed from 80 piasters to 118 piasters to the dollar, and that under the above payment clauses, defendant became obligated to convert contract dollars into piasters at the new and higher rate of 118 piasters for each contract dollar. Plaintiffs maintain that since defendant, subsequent to October 1, 1967, was able to purchase 118 piasters for every dollar and yet only paid plaintiffs at the rate of 80 to 1, defendant will receive a windfall of *62 38 piasters for every contract dollar expended subsequent to October 1,1967, unless plaintiffs are allowed recovery herein.[8]
With respect to payment vouchers and/or invoices submitted after October 1, 1967, there was some confusion and •uncertainty generated by the availability to the United States Government of the 38-piaster subsidy in its purchase of piasters with dollars. When the payment vouchers submitted by plaintiffs were stated in piasters, plaintiffs were paid, as was the case prior to October 1,1967, the number of piasters shown thereon. In the approval section of the voucher, the amount was approved both in piasters and in dollars at a conversion orate of 80 to 1. However, the amount charged to the contracting agency’s appropriation account was a dollar figure arrived at by utilization of a conversion figure of 118 to 1. This, of course, resulted in less of a dollar drain on the appropriation available to the agency. When the voucher was stated in dollars, the paying officer generally would effect a conversion to piasters at the rate of 80 to 1 and pay the piaster product of this multiplication to the contractor. The approval section of the voucher, in such an instance, showed the dollar amount claimed by the contractor, the amount of piasters paid to the contractor and a conversion rate figure of 80 to 1.[9] As indicated above, the account *63 ing classification section of the voucher showed a lesser dollar amount as chargeable to the appropriation account (because of use of the 118 to 1 rate), than appeared in the approval section of the voucher (because of the use of the 80 to 1 rate). On some vouchers, the difference between the dollar amounts claimed by the contractors and that charged to the appropriation account was shown in the “Differences” section of the voucher. In some instances vouchers were submitted by plaintiffs stating the amount due in piasters, but supported by invoices stated in dollars, which were converted into the piaster amount claimed at the rate of 118 to 1. In these instances, defendant’s fiscal or finance officer recalculated the dollar invoices for conversion at the rate of 80 to 1 and reduced the piaster claimed amount accordingly. However, the piaster amounts paid to the contractors were then reconverted to dollars for the purpose of appropriation accounting at the rate of 118 to 1. Plaintiffs point to these internal bookkeeping and accounting activities of defendant as evidence of the “windfall” they allege defendant has reaped from these contracts.
II
The Board avoided the task of interpreting the payment clauses, cited supra, by holding that such clauses were invalid and/or unenforceable because, in the Board’s view, Vietnamese persons and firms were forbidden to sign contracts with the United States in which the consideration was expressed in United States dollars.[10] However, this holding, the Board continued, did not affect the validity of the remaining portions of the contract. Thereafter, the Board noted that plaintiffs’ proposals were cast in piaster amounts; that plaintiffs were paid in piasters, in the amounts so proposed; and concluded plaintiffs had received full payment and were entitled to nothing further. The Board refused to allow the *64 complexity and confusion engendered by accounting conversions and reconversions from piasters to dollars to piasters to cloud the fact that, in its view, the contract amounts paid in piasters to plaintiffs were the same amounts in piasters for which plaintiffs proposed to perform their contracts, which proposals were accepted by defendant.
Defendant has conceded in its brief that the clauses in question are not invalid and unenforceable. The records and briefs before the court support this concession.[11] However, that concession does not resolve the matter. It merely means that the court must now interpret the disputed language of the clauses in question.
It is patently clear that the issues presented to and decided by the Board were legal issues. It is also clear that the issue now before the court, i.e., interpretation of the disputed clauses of the contracts, is also a legal issue. It is firmly established that questions of law are to be decided by the court, Beryllium Corp. v. United States, 196 Ct. Cl. 12, 18-19, 449 F. 2d 362, 366 (1971), unfettered by any prior administrative determination. Max Drill, Inc. v. United States, 192 Ct. Cl. 608, 614, 427 F. 2d 1233 (1970). This does not mean, as plaintiffs seem to imply in their briefs, that an erroneous legal determination by the Board warrants judgments in their favor.
After careful consideration of the facts as found by the Board, or otherwise undisputed in the Board records, and the briefs of the parties, it is concluded that the payment clauses in question anticipated conversion at the official rate of 80 to 1, that this rate was the legal rate of exchange referred to in said clauses, and furthermore that this exchange rate never changed during the lives of said contracts. Since plaintiffs *65 received payment at this rate for performing their contracts they are not entitled to any further recovery.
The court’s task is to attribute meaning to the language in the payment clauses, “legal rate of exchange * * * in effect on the date approved invoices are presented * * * for payment.” First, a determination must be made as to what legal rate of exchange was intended by the parties when they entered into the contracts, and thereafter determine what that rate was on the various dates when invoices were presented for payment.
The Board found that the parties did not submit any evidence as to the reasons for insertion of the clauses in the contract. The clauses were not standard government contract clauses. The plaintiffs argue that the clauses were designed to protect them against a devaluation[12] of the piaster, as well as to warn them that they would not be paid at the black market rate. Defendant suggests that the clauses were merely bookkeeping provisions to allow the government to charge dollars against its accounts while paying piasters to the contractors. There is no direct evidence in the records before the court in support of these contentions. It is noted in the Board records, however, that the official rate of 80 piasters to the dollar had replaced the old official rate of 85 piasters to the dollar on June 18, 1966. The first of the ten contracts in issue was awarded on December 29, 1966. Alert to this devaluation, it would not be unreasonable to view the clauses in question as an effort by the parties to cover themselves in the event of another change in the official rate of exchange.
It has been said that “the language of a contract must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary *66 circumstances.” Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F. 2d 547, 551 (1971); see also Kenneth Reed Constr. Corp. v. United States, 201 Ct. Cl. 282, 288, 475 F. 2d 583, 586 (1973). Examination of tbe contemporary circumstances existing when tbe contracts were negotiated and executed provides a ratber firm foundation on wbicb to gauge tbe intention of tbe parties relative to tbe language in dispute. Tbe ultimate goal of tbe court “is always to give full force and effect to tbe expressed or implied intentions of tbe contracting parties, if sucb can be discerned.” Massachusetts Port Authority v. United States, 197 Ct. Cl. 721, 726, 456 F. 2d 782, 784 (1972).
As indicated earlier, three rates of exchange were utilized in South Vietnam at tbe time tbe contracts were negotiated and executed; i.e., tbe official rate of 80 to 1, tbe consolidated premium rate of 118 to 1 (comprised of tbe official rate of 80 piasters plus tbe subsidy of 38 additional piasters), and the black market rate wbicb was in excess of tbe 118 to 1 exchange rate. It is clear, as indicated previously, that the parties contracted with tbe official rate of 80 to 1 in mind. The bid proposals, in piasters, wbicb were accepted and converted into dollars at the 80 to 1 rate confirm this fact. Since tbe contractors signed their contracts with tbe consideration expressed in dollars, which dollar figures resulted from use of the 80 to 1 conversion rate (see n. 2, supra), the intent of tbe parties is quite clear that tbe legal rate of exchange contemplated in the payment clauses of tbe contracts was tbe official rate of exchange, i.e., 80 to 1. As indicated earlier, both the 80 to 1 rate and tbe 118 to 1 rate were legal rates existing at tbe time tbe contracts were entered into. By selecting the official rate of 80 to 1, tbe parties fingered tbe “legal rate of exchange” wbicb was to govern contract payments.
Tbe question which must be answered next is whether tbe “legal rate of exchange,” within tbe purview of tbe payment clauses, ever changed during contract performance. The answer must be no. Plaintiffs, of course, point to October 1, 1967, when tbe United States was permitted to purchase piasters at the consolidated premium exchange rate (118 to 1) and argue that on this date tbe “effective” legal rate of exchange changed to 118 to 1. Plaintiffs use the word “effective” *67 to indicate that tbe 118 to 1 rate was the conversion rate used almost exclusively in transactions within South Vietnam. The flaw in plaintiffs’ position in this regard is that this “effective” rate of 118 to 1 was in effect in South Vietnam prior to, during and after performance of the contracts in suit as will be demonstrated, infra. The record makes it clear that the official rate of 80 to 1 remained in effect after October 1,1967. This is the important fact. The legal rate of exchange contemplated by the parties in the payment clauses remained the same throughout performance of the contracts.
Plaintiffs make much of the fact that very little transacting of business was done at the 80 to 1 rate. However, this was true, as indicated above, when plaintiffs negotiated and executed their contracts, and it was true throughout contract performance. Accordingly, it is difficult to appreciate plaintiffs’ assertion that from October 1,1967, and thereafter, the “effective legal rate” was 118 to 1. It is just as correct to say that the “effective legal rate” was 118 to 1 from 1966 and thereafter. This is made evident by an analysis of the International Monetary Fund Eeports, referred to previously, which reflects the existence of the two recognized legal rates of exchange, both before and after October 1,1967. Since an “effective legal rate” of 118 to 1 existed from 1966, it cannot be said that it suddenly changed on October 1, 1967. Moreover, it is unreasonable to assume that the payment clauses anticipated payment at the “effective legal rate” (118 to 1) because the parties clearly utilized the official rate (80 to 1) when they contracted with one another. It would be unreasonable to read the payment clauses as meaning that the dollar amount had been arrived at by applying the official rate of 80 to 1 (which was done) but that the piaster figures were to be restored during contract performance by applying the “effective legal rate” of 118 to 1 (which defendant refused to do).
Accepting plaintiff’s view, arguendo, that the clauses were designed to protect the contractors against any change in the legal rate of exchange, it is clear that no changes occurred in either of the two existing legal rates of exchange during contract performance. The official rate remained at 80 to 1 and the “Consolidation Premium,” which plaintiffs are wont *68 to describe as the “effective legal rate,” remained at 118 to 1. Having contracted with defendant at the official legal rate of 80 to 1, at a time when the “effective legal rate” of 118 to 1 was also prominently in existence, no persuasive claim can be made that the “effective legal rate” of 118 to 1 should now be adopted as reflecting the intendment of the parties at the time they entered into the contracts.[13]
We have seen that a contractually contemplated change in the “legal rate of exchange” never occurred at any time material herein. What did occur, however, was that the United States Government was permitted by the South Vietnamese Government to purchase in South Vietnam, commencing on and after October 1,1967,118 piasters for one dollar. Plaintiffs argue, in effect, that the additional 38 piasters should be passed on through to them relative to each contract dollar generated on and after October 1, 1967. Plaintiffs offer no legal authority for the proposition that defendant was obligated to pass this subsidy along to those with whom it had dealings. As indicated above, no contractual obligation existed in this regard. As long as the official legal rate remained at 80 to 1, defendant met its contractual obligations in effecting contract payments to plaintiffs at that rate. Any alleged “windfall” to defendant is no different, in essence, than other situations where one contracting party discovers that it is able to secure contract performance at a lower cost than first anticipated. For example, see Penker Constr. Co. v. United States, 96 Ct. Cl. 1, 36 (1942); see also Carolina Paper Mills, Inc., 58-1 BCA ¶1734, p. 6648. After October 1, 1967, the defendant was able to purchase piasters at the 118 to 1 rate. Absent a contractual obligation, no rule of law requires that defendant pay plaintiffs the additional 38-piaster subsidy it was able to obtain by purchase in its sovereign capacity.[14] In the domains of commerce the govern *69 ment and the contractor are on equal footing and subject to the same laws that govern individuals. Cooke v. United States, 91 U.S. 389, 398 (1875). Both must turn square corners in their dealings with each other. Rock Island Etc. R.R. v. United States, 254 U.S. 141, 143 (1920); St. Regis Paper Co. v. United States, 368 U.S. 208, 229 (1961). If the contracts in question were between private parties, the fact that one of the parties was able to purchase piasters at the exchange rate of 118 to 1 would not, without more, entitle the other parties to recover the additional 38 piasters from the first party merely because it was able, subsequent to entering into the contracts, to obtain a more favorable currency exchange rate. See in this regard Barr v. United States, 324 U.S. 83, 90 (1945). This is even more pronounced in these cases when it is borne in mind that the bids prepared by plaintiffs were submitted in piasters on the basis of an 80 to 1 exchange rate and plaintiffs were paid in piasters on the same basis. We agree with the Board that, under the circumstances, plaintiffs were paid all that they were entitled to receive.
Having concluded that no contractual basis, or any other basis for that matter, exists which would support recovery by plaintiffs herein, it is unnecessary to become immersed in the parties’ imbroglio concerning an alleged “Secret Agreement,” which defendant proffers as an alternative basis for denial of the claims,[15] or face the difficult and delicate question of reciprocity under 28 U.S.C. § 2502 presented by defendant.[16] Likewise, it will not be necessary to deal with the *70 legal effect of releases executed by seven of the ten plaintiffs,[17] nor will it be necessary to dwell on the myriad other matters to which the parties have directed the court’s attention.[18]
Although the extensive briefs of the parties belie the fact, the issue presented to the court is admittedly simply one of contract interpretation. The disputed language in the payment clauses, when read in the light of the circumstances, known to all parties, existing at the time of contract formation and execution can only be read to mean that defendant would make payments in Vietnamese piasters at the official rate of exchange in effect on the date approved invoices were presented for payment. At all times pertinent herein, that official rate, which has been determined herein to be the legal rate contemplated by the parties, was 80 to 1. Accordingly, defendant has fully met its obligations under the contracts.
CONCLUSION
For reasons set forth above, defendant’s motion for summary judgment is granted, plaintiffs’ cross-motion for summary judgment denied and plaintiffs’ petitions dismissed.

 Nichols, Judge, concurs in the result.

 The bid proposals in piasters were converted by defendant into the contract dollar prices by utilizing an exchange rate of 80 piasters to the dollar (hereinafter 80 to 1). For example, in the.Truong Xuan Truc case (Ct. Cl. No. 463 — 72, the bid proposal of some 11,845,000 piasters was converted into the stated contract dollar price figure of $148,062. It is interesting to observe that if an exchange rate of 118 piasters to the dollar (hereinafter 118 to 1) was utilized by defendant in converting the bid proposal into the stated contract dollar price figure, the contract price would have been $100,381. The significance of this observation will become apparent when the contract interpretation contention of plaintiffs is considered infra.

 In the Truong Xuan Truc case (Ct. Cl. No. 463-72), supra, the final contract price stated in dollars was $148,739.97. True was paid some 11,899,198 piasters, representing a conversion rate of 80 to 1. True, before the Board, claimed that it should have been paid some 17,551,316 piasters, representing a conversion rate of 118 to 1. Accordingly, True sought to recover the difference between the above figures, i.e., an additional 5,652,118 piasters. It is apparent that the seed for the dispute between the parties was sown when defendant, for reasons not entirely clear in the Board records, stated the contract price in dollars instead of in piasters. Had plaintiffs’ bid proposal figures, which were stated in piasters, been, on acceptance, stated in piasters in the contracts, it would have been obvious that plaintiffs were being paid the exact amount of piasters for which they agreed to do the work.

 Defendant suggests that since counsel has no express direct authority from nine plaintiffs to continue the litigations, an adverse decision against them now may be challenged at a later time on grounds counsel was not personally authorized to represent them. However, plaintiff Vanaco has authorized counsel to represent it by action of its owner and principal officer. Cf. Algonac Mfg. Co. v. United States, 192 Ct. Cl. 649, 662, 428 F. 2d 1241, 1249 (1970). Since a common issue is involved in all the cases, a decision in one case will be dispositive of all cases, and this fact serves to blunt the thrust of defendant’s suggestion. Defendant has not raised any question as to the capacity of the corporate plaintiffs to maintain actions in this court. See Mather Constr. Co. v. United States, 201 Ct. Cl. 219, 222-25, 475 F. 2d 1152, 1154-56 (1973).

 In addition to these 10 eases there are 13 other cases, referred to as the lease cases, presently pending in this court which also center on the correct rate of exchange to be applied relative to converting dollars into piasters. It is also understood that there are presently other eases pending before the Board which involve this same issue.

 The facts relied on herein are either found by the Board or otherwise undisputed and contained in the Board records. Neither party has effectively established that the Board erred on any significant factual finding. Both parties have submitted documentary materials in support of their respective summary judgment motions which were not submitted to the Board. None of these materials were considered helpful relative to the court’s task of interpreting the disputed clauses of the contracts in issue. Moreover, in Wunderlich Act review cases the parties, as a general rule, cannot supplement the record with additional fact-oriented materials not placed before the Board initially, and this is so in cases where the dispositive issue is deemed to be one of law. See Roscoe-Ajax Constr. Co. v. United States, 198 Ct. Cl. 133, 149, 458 F. 2d 55, 64 (1972); Northbridge Electronics, Inc. v. United States, 195 Ct. Cl. 453, 463-64, 444 F. 2d 1124, 1130 (1971). Accordingly, the extraneous nonrecord material proffered by the parties played no part in the decision reached herein.

 Moreover, it would be unreasonable to expect that defendant would have expressly agreed to pay plaintiffs at the conversion rate of 118 to 1 at a time when it could only purchase plasters at the conversion rate of 80 to 1. See Bateson-Stolte, Inc. v. United States, 158 Ct. Cl. 455, 460, 305 F. 2d 386, 389 (1962).

 Before the Board, plaintiffs sought to have the higher rate of exchange applied to all contract payments both before and after October 1, 1967. While not crystal clear from plaintiffs' pleadings and briefs, a fair reading thereof suggests that plaintiffs’ claims germinated on October 1, 1967, and that the claims they advance herein may be viewed as directed only at approved invoices presented for payment on and after October 1, 1967.

 There were some instances where plaintiffs were paid in piasters at a conversion rate of 118 to 1 and the approval section of the voucher reflected a conversion figure of 118 to 1. However, these vouchers were subsequently recalculated, utilizing a conversion rate of 80 to 1, and the overpayment differences recouped from the contractors in connection with later payments under the same contracts. The fact that some payments were initially processed at the 118 to 1 rate has no probative value relative to evidence of the intention of the parties. The fact that four different contracting officers were involved in these ten cases may well have generated a difference of opinion as to how the matter should be handled. These payments were made in a period of uncertainty and confusion and merit no consideration in the process of interpreting the clauses in question. See Jansen v. United States, 170 Ct. Cl. 346, 354-56, 344 F. 2d 363, 369 (1965). This same observation is also applicable to those few instances where equitable adjustments for ordered changes were negotiated in dollar amounts by converting piaster proposals at the -118 to 1 rate. In these instances a reconversion to piasters was made at the time of payment on the same 118 to 1 basis. Without more, these negotiations are such that it cannot be said that defendant consented to plaintiffs’ view regarding *63 the proper exchange rate to be utilized relative to the contracts’ clauses In question. The basic dispute remained for future resolution. See Lockheed Aircraft Corp. v. United States, 192 Ct. Cl. 36. 44-45, 426 F. 2d 322, 326-27 (1970).

 The Board did observe, In its opinion on plaintiffs’ Reconsideration motion, that “even if we decide that the payment clause was valid and enforceable, we should reach the same results as we did in the decision now under consideration.”

 The Board decision was based on its reading of Republic of Vietnam Decree Law 017/SLU, September 3, 1966, which it believed required contracts in South Vietnam to state the consideration therefor in piasters, together with its reading of Article VIII(2) (b) of the Articles of Agreement of the International Monetary Fund to the effect that the united States agreed to abide by South Vietnam exchange laws. The Board felt that by expressing the contract consideration in dollars, an illegal and/or unenforceable contract resulted. Without elaboration, it would appear that the contracts in issue were not within the purview of Article VIII(2)(b) since they were not “exchange” contracts. Moreover, the contractors were paid in piasters which cast doubt on the Board’s reading of Decree Law 017/SLU. In any event, the Board ostensibly failed to give due consideration to the proposition that contract provisions should be construed, if possible, to be lawful rather than unlawful. See Hobbs v. McLean, 117 U.S. 567, 576 (1886).

 It cannot be said tbat any devaluation of tbe piaster toot place during contract performance for the official rate of exchange of 80 to 1 remained the same at all times material to these cases. Cf. Mercantile Nat’l Bank v. United States, 150 Ct. Cl. 700, 703, 280 F. 2d 832, 834 (1960), where the official rate of exchange between the United States dollar and the Mexican peso was affected by a devaluation of the peso which occurred during contract performances. Compare also ITT Arctic Services, Inc. v. United States, 207 Ct. Cl. 743, 524 P. 2d 680 (1975), where the Canadian Government terminated the fixed official rate of exchange between the Canadian dollar and other world currencies, including the United States dollar, by allowing the Canadian dollar to float in the international money market during contract performance. Neither of these cases, cited and relied on by plaintiffs, have applicability to the situation at hand.

 In other contexts and circumstances use of a commercial (effective) rate of exchange rather than the official rate of exchange may well be found to be legally proper. See e.g., Pan-American Life Ins. Co. v. Blanco, 362 F. 2d 167 (5th Cir.1966); see also 5 corbin on contracts § 1005. In the instant oases, however, the parties by their contracts agreed to the rate of exchange that would govern their dealings with each other.

 The courts have long recognized a distinction between actions involving the united States in its sovereign capacity and acts it performs as a contractor. See Horowitz v. United States, 267 U.S. 458, 461 (1925); Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455, 471-72, cert. denied, 375 U.S. 879 (1963).

 Defendant maintains that when the united States Government was permitted to purchase piasters at the exchange rate of 118 to 1, the united States Embassy in South Vietnam agreed with the South Vietnamese Government that the 38-piaster premium would not be passed on the South Vietnamese contractors. The Board, referring to that part of the agreement mentioned above as an “apparent hand-shahe agreement,” did not rely on it in reaching its determination. The basic written agreement itself was not part of the Board records since it had not been declassified as of the time the records before the Board were closed. This written agreement was subsequently declassified and available. The decision herein is not based on or affected in any way by the so-called “Secret Agreement.”

 By Order dated June 15, 1973, the Court denied defendant’s motion to dismiss the petitions on the reciprocity question, remanding the matter to the trial judge for further proceedings. The record, wholly documentary, now before the court on the reciprocity question is still considered insufficient to *70 permit of an enlightened decision thereon. Moreover, the question is complicated by the fall of the Republic of South Vietnam on or about April 30, 1975. With the fall of the Republic of South Vietnam, Foreign Assets Control Regulations were amended on May 1, 1975, to add South Vietnam to the schedule of blocked countries. See 40 Fed. Reg. 19202, 31 C.F.R. § 500. The disposition of these litigations on other grounds pretermits this and related troublesome questions.

 Three plaintiffs (Ct. Cl. Nos. 456-72, 457-72, 463-72) did not execute releases and are therefore beyond the pale of defendant’s release defense. The seven plaintiffs who signed releases challenge not only the legal sufficiency of the releases themselves but also the legal efficacy of their actions under the circumstances which existed when they executed them, i.e., defendant improperly Induced plaintiffs to sign the releases and/or improperly refused subsequently to allow plaintiffs to renounce these executions. No decision is reached on the release defense offered by defendant. See Jefferson Constr. Co. v. United States, 151 Ct. Cl. 75, 91-92 (1960).

 For example, the parties unnecessarily debate the fifth amendment rights of resident and nonresident aliens. Further, plaintiffs’ reliance on quantum meruit as an alternative legal theory for recovery overlooks the principle that there can be no recovery on this theory where there are valid express contracts between the parties. National Trailer Convoy, Inc. v. United States, 170 Ct. Cl. 823, 827-28, 345 F. 2d 573, 576 (1965). Plaintiffs also allude in their moving brief to fraud on the part of various government officials relative to proceedings before the Board and thereafter. The argumentative allegations in their brief in this regard are devoid of substance. “Well-nigh irrefragable proof” is necessary to support fraud charges directed at government officials. Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954); see also Librach and Cutler v. United States, 147 Ct. Cl. 605, 612 (1959).