# United States Court of Appeals for the Federal Circuit

2007-5046

PACIFIC GAS AND ELECTRIC COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Carter G. Phillips, Sidley Austin LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Virginia A. Seitz and Ruthanne M. Deutsch. Of counsel on the brief were Jerry Stouck and Robert L. Shapiro, Greenberg Traurig LLP, of Washington, DC.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Jeanne E. Davidson, Director, Alan J. Lo Re, Senior Attorney, Joshua E. Gardner and Scott R. Damelin, Trial Attorneys. Of counsel on the brief was Jane K. Taylor, Attorney, Office of General Counsel, United States Department of Energy, of Washington, DC.

Ronald A. Schechter, Arnold & Porter LLP, of Washington, DC, for amici curiae Southern Nuclear Operating Company, et al. Of counsel on the brief were M. Stanford Blanton, Ed R. Haden, and K.C. Hairston, Balch & Bingham LLP, of Birmingham, Alabama.

Appealed from: United States Court of Federal Claims

Judge Emily C. Hewitt

# United States Court of Appeals for the Federal Circuit

2007-5046

PACIFIC GAS AND ELECTRIC COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 04-CV-74 and 04-CV-75, Judge Emily C. Hewitt.

_____

DECIDED:  August 7, 2008

_____

Before MAYER, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

This appeal involves the damages calculation for the partial breach by the United States of its contract with the nuclear utilities, in this case, Pacific Gas & Electric Co. (PG&E), for the storage of high-level nuclear waste (HLW) and spent nuclear fuel (SNF).  Because the United States Court of Federal Claims erred in its determination of the rate at which the contract obligated the Department of Energy (DOE) to accept the utilities' HLW and SNF, this court reverses-in-part and remands.

I

PG&E owns Humboldt Bay and Diablo Canyon, two nuclear power generation stations in California. Humboldt Bay shut down temporarily in 1976, but never restarted due to concerns about seismic activity and regulatory uncertainties. Diablo Canyon's two reactors remain operational, supplying about 10% of California's energy needs. Like the other nuclear utilities, PG&E entered into a Standard Contract with DOE, as discussed in greater detail below, which obligated DOE to take title to and dispose of PG&E's SNF and HLW. In exchange, PG&E paid a one-time fee of approximately $4 million to cover non-"in-core" fuel, used for generation of electricity before April 7, 1983, and committed to paying ongoing contract fees (approximately $5 million per quarter) to DOE's Nuclear Waste Fund.

DOE did not begin accepting fuel from PG&E (or from any other nuclear utility, for that matter) by January 31, 1998, as required by the Standard Contract. In fact, DOE has not even yet performed under the contract. Meanwhile, PG&E continues to pay its quarterly contract fees. In addition PG&E has continued to store its SNF/HLW on-site at Humboldt Bay and Diablo Canyon. A series of cases has established that DOE has partially breached the contract by failing to begin its performance on January 31, 1998. See Ind. Mich. Power Co. v. United States, 422 F.3d 1369, 1376-77 (Fed. Cir. 2005) (Ind. Mich. III); Me. Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000). Thus this case deals only with the question of damages for that partial breach.

As explained further below, the Court of Federal Claims concluded that the duty of good faith and fair dealing required "reasonable performance," as defined by the

circumstances existing at the time and based on the requirements of the Standard Contract. Relying primarily on DOE's reports from 1991, the Court of Federal Claims awarded PG&E approximately $42.76 million in damages through December 31, 2004, about half the amount PG&E had sought. Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 432 (2006) (PG&E I). PG&E appeals the Court of Federal Claims' interpretation of the Standard Contract to require an acceptance rate according to the 1991 numbers, as well as the Court of Federal Claims' exclusion of the proffered expert testimony of Mr. Frank Graves, its exclusion of Greater Than Class C (GTCC) waste from the contract, and its issuance of a final judgment, rather than a partial judgment, under Court of Federal Claims Rule 54(b).

## II

This court reviews contract interpretation as a question of law, without deference. Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Evidentiary rulings are reviewed for abuse of discretion. Flex-Rest, LLC v. Steelcase, Inc., 455 F.3d 1351, 1357 (Fed. Cir. 2006) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-43 (1997)).

### Acceptance Rate

In setting the rate at which DOE was obligated to accept SNF/HLW from PG&E and the other utilities under the Standard Contract, the Court of Federal Claims improperly relied on a unilateral DOE estimate made far after contract formation and tainted by a statutory framework in place at that time, which, if left unchanged, would have rendered timely performance impossible. To understand the contours of the parties' expectations and intent, and ultimately to discern the appropriate acceptance

rate from the contract itself and the parties' dealings, this court will briefly set forth the byzantine process leading up to and following the execution of the Standard Contract.

A Brief History of the Standard Contract

On January 7, 1983, Congress enacted the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425 (codified at 42 U.S.C. §§ 10101-10270) (NWPA or Act). The Act set forth four objectives: 1) to develop repositories to protect the public and the environment from SNF and HLW; 2) to establish federal responsibility and a definite federal policy for the entire project; 3) to define the relationship between the federal government and the states and tribes with respect to SNF/HLW disposal; and 4) to establish a Nuclear Waste Fund, financed by the nuclear utilities, to pay for the waste disposal. 42 U.S.C. § 10131(b) (2000). The Act assigned DOE the obligation to begin acceptance and disposal of the utilities' SNF and HLW "not later than January 31, 1998." Id. § 10222(a)(5)(B). In return, the Act obligated the utilities to pay fees "in an amount equivalent to an average charge of 1.0 mil per kilowatt-hour for electricity generated by . . . [SNF], or . . . [HLW] derived therefrom." Id. § 10222(a)(3). The NWPA also required DOE to take title to the SNF and HLW "as expeditiously as practicable." Id. § 10222(a)(5)(A). To accomplish these tasks, the Act required DOE to enter into contracts with the nuclear utilities no later than June 30, 1983. Id. § 10222(b)(2)(A). The utilities had little choice but to enter into these contracts, because the Act also precluded the Nuclear Regulatory Commission (NRC) from issuing licenses to utilities that had not contracted with DOE for SNF/HLW disposal or were not in the process of good-faith negotiations for doing so. See id. § 10222(b)(1)(A); Me. Yankee, 225 F.3d at 1337.

In April 1983, DOE promulgated the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract) after a lengthy notice and comment process. Various utilities and industry groups, among others, provided specific suggestions to DOE during this process. Although numerous commentators advocated the inclusion of a firm commitment from DOE on its rate of disposal, DOE instead agreed to take title to SNF/HLW "as expeditiously as practicable" "following commencement of operation of a repository." 10 C.F.R. § 961.11 (1984). The Standard Contract also included provisions setting priority for acceptance of waste (generally through an oldest fuel first (OFF) scheme) and allowed utilities to swap approved delivery commitment schedules (the Exchanges provision). In lieu of a firm rate for SNF/HLW acceptance and disposal, the Standard Contract required DOE to issue annual capacity reports (ACRs) beginning no later than July 1, 1987. These reports set forth projected annual receiving capacity for DOE facilities and annual acceptance rankings, including projected capacity information for the first ten years of operation for the repository. In addition to the annual reports, the Standard Contract also required DOE to issue annual acceptance priority rankings beginning April 1, 1991. In response to these priority reports, the Standard Contract obligated each utility to submit a delivery commitment schedule to DOE to identify the SNF/HLW ready for delivery to DOE beginning sixty-three months after the DCS submission. This court refers to this entire process as the acceptance capacity schedule or ACS process.

On December 20, 1983, DOE set forth its plan for a firm schedule for waste acceptance and removal beginning no later than the statutorily-mandated date (January 31, 1998). Specifically, the schedule was "designed to provide an acceptance rate in

the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." PG&E I, 73 Fed. Cl. at 355 (quoting 1983 Mission Plan). The preliminary schedule in this plan envisioned that DOE would begin accepting waste in 1998 at a rate of 1,800 metric tons of uranium (MTU) per year until 2003, when DOE would begin accepting 3,000 MTU/year. This 1983 plan also cautioned that completion of a geologic repository by 1998 was "optimistic," requiring resolution of several regulatory, institutional, and technical challenges. As a contingency in case the permanent repository would not be available to meet the 1998 deadline, the plan stated that DOE would request congressional authorization to build a monitored retrievable storage (MRS) facility as an interim solution. See, e.g., id. at 354-56. The trial court found in effect that the nuclear industry, in the guise of Edison Electric Institute Vice President Loring Mills, understood the preliminary schedule in the 1983 plan as aspirational, not binding. Indeed, the trial court quoted Mr. Mills' public announcement from 1983 that "[w]e really were never under an illusion that we would get a fair and equitable contract with DOE, with firm commitments and detailed performance standards, with penalties for non-performance." Id. at 358.

In June 1985, the DOE issued another plan with two different schedules, one assuming an MRS facility, and one not. The schedule contemplating an MRS called for a pre-1998 acceptance rate of 2,200 MTU/year, and 3,000 MTU/year starting in 1998. The non-MRS schedule called for 400 MTU/year beginning in 1998, ramping up to 3,000 MTU/year within five years. This 1985 plan noted that these schedules were

"illustrative . . . only," and underscored the possibility of "considerable variation." Id. at 359 (quoting 1985 Mission Plan).

In 1987, DOE submitted an amendment to its 1985 plan to Congress. This 1987 plan informed Congress that opening a permanent geologic repository by 1998 was no longer a realistic goal and recommended authorization for DOE to use an MRS facility to meet its obligations to accept SNF/HLW as specified by the Act. The 1987 amended plan also revised the waste acceptance schedule, estimating acceptance at a rate of 1,200 MTU/year in 1998, assuming availability of an MRS facility, and ramping up to 2,000 MTU/year in 2003 and eventually to 2,650 MTU/year in 2004. These numbers matched DOE's annual capacity report (ACR) process numbers for that year. To dispel doubts about DOE's commitment to a permanent repository, DOE proposed that the MRS facility would accept no waste until the NRC authorized construction of a permanent repository. Commenting on the draft of this 1987 plan, the Edison Electric Institute opposed this "linkage" because it would "raise a significant question whether DOE will be able to meet its statutory and contractual commitment to begin to accept spent fuel in January 1998." Id. at 361 (quoting EEI comments regarding 1987 Mission Plan Amendment).

On December 22, 1987, Congress amended the NWPA by passing the Nuclear Waste Policy Amendments Act of 1987 (1987 Amendments Act), Pub. L. No. 100-203, §§ 5001-65, 10 Stat. 1330 (codified in scattered sections of the NWPA, 42 U.S.C. §§ 10101-10270). The 1987 Amendments Act directed DOE to develop a single permanent geologic repository at Yucca Mountain, and to cease activities at other sites. The 1987 Amendments Act also included a "linkage" provision. But unlike DOE's

proposed linkage between MRS facility <u>operation</u> (i.e. acceptance of waste) and permanent storage authorization, the Act precluded MRS facility <u>construction</u> until the NRC authorized a permanent storage repository. The 1987 Amendments Act also capped the total storage at an MRS facility at 10,000 MTU. Because of these provisions, the industry quickly realized that DOE would be unable to get an MRS facility in place in time to meet its 1998 acceptance obligation. While appealing to Congress to reconsider the linkage provisions of the 1987 Act, DOE issued additional ACRs in 1988, 1990, and 1991.

In 1991, DOE issued another amendment to its plan. This amended plan proposed an MRS facility, but acknowledged that repeal of the 1987 linkage provision would have to occur first. The 1991 plan set forth a projected waste acceptance schedule that matched DOE's 1991 ACR process numbers. Assuming an MRS facility in place, the plan set the acceptance rate at 300 MTU/year in 1998, ramping up to 875 MTU/year in 2001. After 2001, this plan held the acceptance rate steady until a permanent repository would come online in 2010, at which time the MRS would begin accepting 1,800 MTU/year. Like the earlier plans and amendments, this schedule was not guaranteed. Instead, DOE explained that the projected capacity "would provide enough Federal storage, between the start of operations at the MRS facility and at the repository, <u>to substantially reduce</u> the need for utilities to add new storage capacity at existing facilities after 1998." <u>PG&E I</u>, 73 Fed. Cl. at 363 (quoting 1991 Draft Mission Plan Amendment) (emphasis added).

Congress has not modified the linkages in the 1987 Amendments to the NWPA. Without a licensed permanent repository, DOE has never built an MRS facility. In 1995,

DOE issued a final interpretation of waste acceptance issues, concluding that DOE had no statutory or contractual obligation to accept SNF/HLW beginning on January 31, 1998 in the absence of a facility constructed under the NWPA and its 1987 amendments. Several utilities challenged this interpretation. The United States Court of Appeals for the District of Columbia Circuit vacated DOE's Final Interpretation, holding that DOE does have a statutory obligation "reciprocal to the utilities' obligation to pay" to dispose of waste beginning January 31, 1998. Ind. Mich. Power Co. v. Dep't of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996). Because DOE's failure to perform constituted a partial breach of the Standard Contract, PG&E's suit in the Court of Federal Claims focused on damages owed to PG&E by the United States to compensate for the expenses incurred as a result of DOE's partial breach.

The Required Acceptance Rate under the Standard Contract

This court interprets a contract in accordance with its language. See Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993) (citing Gould, Inc v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). Generally, this court also construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative. See Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

In setting the proper acceptance rate to measure damages, the Court of Federal Claims did not find DOE had an obligation to accept SNF/HLW at a rate that would prevent the utilities from bearing the costs of additional on-site waste storage facilities

after January 31, 1998.  The hypothetical acceptance rate that would have obviated the need for onsite storage was around 3,000 MTU/year, according to PG&E.  Instead, the Court of Federal Claims concluded that the duty of good faith and fair dealing required "reasonable performance" under the existing circumstances and the requirements of the Standard Contract.  PG&E I, 73 Fed. Cl. at 397-98.  To determine the reasonable performance rate, the Court of Federal Claims consulted DOE's 1991 ACS reports and PG&E's approved schedules.  According to the trial court, these reports, while not contractually binding, represented the parties' understanding that this was "the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule[] would be determined, and the parties substantially carried out this process before DOE's breach."  Id. at 399.

Adopting the 1991 reports as a baseline, the Court of Federal Claims found that DOE would have accepted SNF/HLW from the utilities at 400 MTU/year beginning in 1998, 600 MTU/year in 1999, and 900 MTU/year from 2000–2007.  The trial court further found that DOE would have accepted approximately all of the Humboldt Bay spent fuel by 2001, but that DOE would not have accepted any of Diablo Canyon's spent fuel by the end of 2007.  Id. at 399-400.

As noted by the trial court, the Standard Contract did not contain a specific acceptance rate.  Instead, the Standard Contract provided a mechanism for establishing an acceptance rate through the ACS process.  The contract sets forth DOE's responsibilities in Article IV(B):

> 5.  (a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian

nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

    (b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report [(ACR)] for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11 (1984). The utilities' responsibilities appear in Article V(B):

    1. Delivery commitment schedule(s) . . . for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed [APR], as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt.

Id. From these clauses, the trial court declined to read a "reasonable rate" provision into the Standard Contract, and specifically rejected PG&E's proposed 3,000 MTU/year target. PG&E I, 73 Fed. Cl. at 386. The Court of Federal Claims reasoned that adopting the 3,000 MTU/year rate would render the ACS process meaningless or inoperative. Id. at 387. The trial court's approach, up to this point, adhered to standard contract interpretation principles.

The Court of Federal Claims next considered Restatement (Second) of Contracts § 204, which governs the insertion of an essential term allegedly absent from the agreement: "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." The Court of Federal Claims looked to the examples provided by the comments to § 204,

decided that none of them applied, and thus declined to use § 204 to read a specific acceptance rate term into the Standard Contract. Concluding that the Standard Contract lacked a specific acceptance rate term and that one could not be inserted as an omitted term under Restatement § 204, the Court of Federal Claims turned to the duty of good faith and fair dealing to require "good-faith performance" or "reasonable performance" by DOE, which the trial court equated with the 1991 ACS rates. See PG&E I, 73 Fed. Cl. at 378-81.

The Court of Federal Claims' selection of the 1991 ACS rate cannot be correct. At the outset, as the Court of Federal Claims correctly recognized, the damages analysis for the partial breach requires some minimum acceptance rate. Moreover, without an acceptance rate, the contract would be meaningless and nonsensical because DOE could opt to accept waste at zero MTU/year and satisfy its performance obligations without actually doing anything. The acceptance rate is thus an essential term of the contract.

While the Standard Contract did not spell out a particular numeric or descriptive acceptance rate, it did set forth the specific mechanism for calculating that rate, that is, the ACS process. While not explaining the ACS process in great detail, the contract specified that the ACS process was the basis for calculating an acceptance rate. In sum, the language of the contract specifies that the ACS process provides the contractual acceptance rate.

Alternatively, this court sees § 204 of the Restatement as another way to reach the same result. Because the brief contractual description of the ACS process does not disclose an actual acceptance rate, the acceptance rate arguably constitutes an omitted

term in the Standard Contract. Thus, the language of § 204 applies to this case. The acceptance rate is, as per § 204, "a term which is essential to a determination of [the parties'] rights and duties," which the parties did not include (or, at least, did not adequately define) in the contract itself. Thus, § 204 justifies a reasonable substitute for the omitted term. Ultimately, whether acceptance rate is viewed as an omitted term that can be supplied by § 204 or instead as a term of the contract calculated through the ACR process set forth explicitly in the contract, the outcome is the same: the ACR process provides the most reasonable approach to setting an acceptance rate. As the trial court correctly noted, the ACR process provides "the most suitable—and perhaps only"—method of setting the rate.

As described earlier, the Court of Federal Claims declined to apply Restatement § 204 to read an acceptance rate term into the Standard Contract because this case did not match any of the examples in the comments to § 204. This court's § 204 analysis is merely an alternative to the preferable reasoning based on the contract language itself, but nonetheless this court notes that the comments to § 204 do not present an exhaustive list of potential situations for application of the principle embodied within § 204. This case presents a situation that falls squarely within the language of § 204 itself, even if not within one of the examples.

Because the ACS process provides the mechanism for calculating the acceptance rate under the contract, the salient question becomes which ACS to use. DOE issued its first report in June 1987, in compliance with the Standard Contract, followed by additional reports in June 1988, December 1990, and December 1991.

In its "Illustrative Waste Acceptance Schedule for the First 10 Years of Facility Operation," the June 1987 report planned to accept SNF/HLW from the utilities at a rate of 1,200 MTU/year in 1998, ramping up to 2,000 MTU/year by 2003, and then to 2,650 MTU/year from 2004 through 2007. After DOE issued its June 1987 ACR, Congress passed the 1987 Amendments Act to the NWPA, which, as described above, implemented a linkage requirement precluding DOE from constructing an MRS facility without authorization for a permanent storage repository. Moreover the 1987 Act capped the capacity of an MRS facility to 10,000 MTU until operation of a permanent repository, and to 15,000 MTU thereafter. From the passage of the 1987 Act onward, DOE drastically reduced each subsequent report, no doubt reflecting accurately the impossibility of full contract compliance under these new linkage terms. In its December 1991 report, DOE projected a waste acceptance schedule of 300 MTU/year beginning in 1998, with up to 875 MTU/year in 2001, and up to 1,800 MTU/year in 2010, when the permanent repository was projected to come online.

The Court of Federal Claims adopted the 1991 ACS process for calculating rate commitments and damages relying on the duty of good faith and fair dealing. See PG&E I, 73 Fed. Cl. at 399. The trial court did not, however, sufficiently explain its choice of the 1991 process over earlier reports. As noted earlier, this court agrees with the Court of Federal Claims that the ACS process is "the express mechanism in the Standard Contract that the parties intended to be used to determine DOE's acceptance rate and that the parties actually and substantially applied to make such a determination," id. at 398, and is thus the proper basis for determining the acceptance rate. However, this court disagrees with the Court of Federal Claims' conclusion that

the 1991 ACS process provides the most accurate reflection of the parties' intent for full contract performance.

Incidentally, the Government advocated the 1991 process to the trial court as the correct acceptance rate. With that argument, the Government implicitly conceded that DOE also considered the ACS process to set the contract's acceptance rates.

The ACS processes are all post-formation conduct in relation to the language of the contract. Nonetheless the contract itself specified that this process would set the proper acceptance rate. Because this court relies on this post-formation conduct to interpret the contract itself, the most accurate picture of the parties' intent for this contract is their conduct at a time when both parties still anticipated timely and full performance of the contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983) (per curiam) ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." (citing Macke Co. v. United States, 467 F.2d 1323, 1325 (Ct. Cl. 1972))); Macke, 467 F.2d at 1325 ("[H]ow the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself.").

The 1991 ACS process does not reflect the parties' intent regarding the contractual acceptance rate. The 1991 process came after the passage of the 1987 Amendments Act. Therefore its projections incorporated that Act's linkage requirements that prohibited acceptance without some difficult (and even yet unachieved) prior actions. The 1991 report assumed that Congress would change its mind. DOE pointed out in its 1991 report that the projected acceptance rates "do not reflect the MRS facility

schedule linkages with the repository development that were imposed by the NWPA." PG&E I, 73 Fed. Cl. at 368 (quoting December 1991 Annual Capacity Report). In other words, the 1991 acceptance rates themselves were scarcely possible in the environment after the 1987 Amendments Act.

Indeed the record shows that the linkages imposed by the 1987 Amendments presented the specter of an impending breach. This specter necessarily tainted the 1991 report. With strict linkages and no resolution of the permanent repository problem forthcoming, DOE's timely performance of its full contractual obligations had, by then, already become a distant possibility. In fact, in its June 1988 report, DOE explained that the linkage provisions made "operations of and waste acceptance at a DOE facility significantly before 2003 unlikely." PG&E I, 73 Fed. Cl. at 367 (quoting June 1988 Annual Capacity Report).

The record also suggests that DOE may have put forth the 1991 acceptance rates as a litigation strategy, to minimize DOE's exposure for its impending breach, rather than as a realistic, good faith projection for waste acceptance. The Court of Federal Claims judge in the companion Yankee Atomic Electric Co. v. United States, 73 Fed. Cl. 249 (2006) (Yankee I) case credited the testimony of a former DOE contractor who stated at trial that the 1991 ACR was intended to limit DOE's liability for breach of contract. Id. at 273. For these reasons, among others, this court concludes that the 1991 report does not present an acceptable acceptance rate under the Standard Contract.

In contrast, the June 1987 ACS process occurred several months before the passage of the 1987 Amendments Act (in December 1987), that is, before the linkage

requirements made DOE's breach virtually inevitable. The record suggests that in 1987, both the DOE and the nuclear utilities realistically expected that DOE would accept SNF/HLW on schedule.

This court has considered that even the 1987 report could reflect some distortion, given its preparation nearly contemporaneous with the 1987 Amendments Act. DOE's submission to Congress in 1987, as discussed above, included a request for an MRS facility in connection with DOE's projected waste acceptance rates. The record shows, however, that Congress rejected DOE's proposal and imposed more stringent linkage requirements, forbidding even the construction of an MRS facility before NRC authorization of a permanent repository. In other words, DOE proposed a linkage between MRS operation and a permanent repository in 1987 and apparently foresaw that such linkage might jeopardize the obligation to accept waste by January 31, 1998. Nonetheless, DOE was merely addressing a contingency rather than a known reality at the time of the 1987 report. The 1987 ACR process therefore provides the best available pre-breach snapshot of both parties' intentions for an acceptance rate.

After the 1987 Amendments Act, breach became highly likely or inevitable because of the strict linkage requirements. Later ACS reports became tainted by the impending breach and even impending litigation strategies. In sum, the 1987 report is an ACS report that contemplated full and timely performance. Thus, this report presents the most reasonable measure of the contractual acceptance rate. Accordingly this court offers the Court of Federal Claims on remand the opportunity to recalculate damages based on that rate.

The trial court relied heavily on the duty of good faith and fair dealing to set the rate according to the 1991 ACS rate. In fact, an accurate assessment of the duty of good faith and fair dealing would reach the same result this court reaches with this opinion. Indeed the duty of good faith and fair dealing contemplates a method of setting a reasonable rate for full compliance with the contract. After all, parties to a contract agree to perform fully, not partially. Thus the "reasonable" remedies under good faith and fair dealing duties would seek a rate based on full performance. The 1987 report was the last attempt to comply with the terms of the contract. After the 1987 Amendments Act, full compliance was a remote, even impossible, goal, and later reports reflected that reality.

For these reasons, this court concludes that the Standard Contract required DOE to accept SNF/HLW in accordance with the 1987 ACR process. On remand, the Court of Federal Claims will have the opportunity to calculate the damages owed to PG&E for DOE's partial breach of the Standard Contract on this basis.

Expert Testimony

At trial, the government successfully moved in limine to exclude the testimony of PG&E's expert Frank Graves. Mr. Graves was proffered as an expert in economics and business management, and would have provided the Court of Federal Claims with analysis of both a reasonable waste acceptance rate and of a prospective course of dealing for exchange of spent fuel acceptance allocations amongst the utilities if DOE had actually started accepting waste. The Court of Federal Claims excluded Mr. Graves for lack of experience or involvement with the DOE waste acceptance program. The court also considered Mr. Graves' modeling speculative. PG&E I, 73 Fed. Cl. at

436. This court notes, however, that Mr. Graves did testify in other proceedings before the Court of Federal Claims. See, e.g., Yankee I, 73 Fed. Cl. at 299.

Mr. Graves' lack of involvement with the DOE waste acceptance program gave the Court of Federal Claims a reasonable basis for excluding his testimony. This court does not address at all the trial court's assessment that Mr. Graves' testimony would have been speculative. Moreover this court sees no difficulty in the decision of the Court of Federal Claims to accept Mr. Graves' testimony in Yankee I. Examining Judge Hewitt's decision in this case, as it must under the proper standard of review, however, this court detects no abuse of discretion in excluding Mr. Graves' testimony.

GTCC Waste

In the companion case to this appeal, Yankee Atomic Electric Co. v. United States, No. 2007-5025 et al. (Yankee II), this court discusses at length the requirements of the Standard Contract with respect to GTCC waste. This court incorporates that section into this decision as well. Therefore, the Court of Federal Claims will have the opportunity to account for GTCC waste disposal on remand.

Final Judgment under Court of Federal Claims Rule 54(b)

As with GTCC waste, this court resolved this Court of Federal Claims Rule 54(b) issue in the companion case. Again for the reasons stated in Yankee II, this court affirms this decision of the Court of Federal Claims.

AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED

COSTS

Each party shall bear its own costs.