ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Anderson Contracting, LLC | ) | ASBCA No. 63632 |
| | ) | |
| Under Contract No. W912P8-21-C-0043 | ) | |

APPEARANCES FOR THE APPELLANT:    Christopher Solop, Esq.
                                   Lynn Patton Thompson, Esq.
                                     Biggs, Ingram & Solop, PLLC
                                     Jackson, MS


APPEARANCES FOR THE GOVERNMENT:    Michael P. Goodman, Esq.
                                     Engineer Chief Trial Attorney
                                   William G. Meiners, Esq.
                                     Engineer Trial Attorney
                                     U.S. Army Engineer District, New Orleans

OPINION BY ADMINISTRATIVE JUDGE MCLISH

Appellant Anderson Contracting, LLC (Anderson) claims it has been underpaid on a contract with the United States Army Corps of Engineers (USACE) to construct a seepage berm on the grounds of Angola State Prison in West Feliciana Parish, Louisiana. Anderson contends that USACE failed to pay it for the full amount of compacted fill material it provided to construct the berm. The contract contained an estimated amount of compacted fill and provided that Anderson would be paid the actual amount of fill it placed, measured on the basis of quantity surveys the USACE would conduct. Anderson contends that USACE's quantity survey was not taken in accordance with the contract requirements, resulting in an understatement of the amount of compacted fill Anderson provided and a failure to pay Anderson the full amount due. USACE's contracting officer rejected Anderson's claims and Anderson appealed to the Board.

The parties elected to proceed under the Board's Rule 11, which provides for resolution on the written record without an oral hearing. The parties agreed that the Board would address only entitlement at this stage.

We deny the appeal.

I. **The Contract**

1. On July 2, 2021, the USACE issued Solicitation No. W912P821B0059 (Solicitation) for "clearing and grubbing, placement [of] compacted fill for an earthen seepage berm, fertilizing, seeding and mulching, borrow pit development of a Government furnished borrow area, maintenance of access roads and other incidental work" at Angola State Prison, located in West Feliciana Parish, Louisiana (R4, tab 4 at 8-9; Joint Stipulation of Facts (Joint Stip.) ¶ 1).

2. On August 12, 2021, Anderson was awarded Contract No. W912P812C0043 (Contract) for $1,892,020 (R4, tab 4 at 8-9, 12; Joint Stip. ¶ 3).

**A. Measurement and Payment for Compacted Fill**

3. Contract Line Item No. (CLIN) 0006, Embankment, Compacted Fill, estimated a quantity of 81,000 cubic yards of compacted fill, priced at $13.00/CY for a total of $1,053,000 (R4, tab 4 at 12; Joint Stip. ¶ 4).

4. Paragraph 1.3.1 of the Embankment specifications addresses how the amount of compacted fill would be measured for payment purposes:

> Unless otherwise specified, compacted fill materials of any description specified in this section will be measured for payment by the cubic yard, and quantities will be determined by the average end area method. The basis for the measurement will be cross sections of the areas to be filled taken prior to clearing, grubbing, and vegetation removal operations and the theoretical design sections. Embankment not constructed to design grade and section, including allowable tolerance as indicated on the Contractor's compliance survey will not be accepted. There will be no separate measurement or payment for tolerances. Embankment quantities for payment will be determined by the government.

(R4, tab 4 at 412)

5. The "cross sections of the areas to be filled" were to be established by quantity surveys to be conducted by USACE.[1]  As indicated in Paragraph 1.3.1, the cross-sections were to be taken "prior to clearing, grubbing, and vegetation removal operations. . . ."  (*Id.*)

## B. Clearing and Grubbing

6. The Contract contains specifications for Clearing and Grubbing, which provides at Paragraph 1.2:

> No measurement will be made for clearing and grubbing. Payment will be made at the contact job price for "Clearing and Grubbing".  Price and payment shall constitute full compensation for furnishing all plant, labor, materials, and equipment; and performing all operations necessary for clearing and grubbing of the areas specified herein or indicated on the drawings, for removing and disposing of all cleared and grubbed materials, and for filling holes resulting from grubbing operations.

(R4, tab 4 at 391; Joint Stip. ¶ 5)

7. Paragraph 3.2 of the Clearing and Grubbing specifications is entitled "Clearing."  Paragraph 3.2.1 defines "clearing":

> Clearing, unless otherwise specified, shall consist of the complete removal above the ground surface of all trees, stumps, down timber snags, brush, vegetation, loose stone, abandoned structures, fencing, and similar debris. Growth standing in water in areas that are not drained in accordance with Section 31 24 00.00 12 EMBANKMENT, paragraph Drainage may be cut off so as not to protrude more than 12 inches above the existing water surfaces.

(R4, tab 4 at 392; Joint Stip. ¶ 6)

8. Two paragraphs later, under the sub-heading "Government Surveys," Paragraph 3.2.3 provides:

---

[1] The contract includes, by full text, FAR 52.236-16, Quantity Surveys, which provides in relevant part that the Government would perform original and final surveys and make computations based on them (R4, tab 4 at 33-34).

The Contractor shall clear the baseline traverse, centerline traverse, and ranges at all P.C.'s, P.l.'s, P.T.'s, 100-foot centerline stations and tie-in stations to facilitate the taking of original cross-sections by the Government. This clearing shall consist of the removal to within 6-inches of the ground surface of all trees, brush and vegetation. This clearing shall be completed in 5,000-foot increments and in advance of embankment construction by a minimum of 1,000 feet.

(R4, tab 4 at 392; Joint Stip. ¶ 7)

9.  Paragraph 3.3 of the Clearing and Grubbing specification is entitled "Grubbing." Paragraph 3.3.1 defines "grubbing":

Grubbing shall consist of the removal of all stumps, roots, buried logs, pipes, drains, and other unsuitable matter as described in Section 31 24 00.00 12 EMBANKMENT, paragraph Materials.

(R4, tab 4 at 393; Joint Stip. ¶ 8)

10.  Paragraph 3.3.2.1 provides:

Grubbing shall be performed within the limits of the embankment together with the 5-foot strips contiguous thereto. All roots and other projections over 1-1/2- inches in diameter shall be removed to the depth of 3-feet below the natural surface of the ground or surface of existing embankments and to a depth of 3-feet below the subgrade for the foundation of structures. The areas to be grubbed are those specific areas within the limits specified herein above from which trees, stumps, down timber, snags, abandoned structures, and other projections have been removed.

(R4, tab 4 at 393; Joint Stip. ¶ 9)

## II.    The Government Survey

11.  The USACE issued a Notice to Proceed to Anderson on August 25, 2021 (R4, tab 4 at 7; Joint Stip. ¶ 10).

12.  USACE issued a task order for surveying services to EMC, Incorporated (EMC) to perform the government survey that would provide the basis for measuring the amount of compacted fill Anderson provided when it constructed the berm, per Paragraph 1.3.1 of the Embankment specifications (R4, tab 19).

13.  On October 7, 2021, the USACE conducted a Preconstruction Conference. The minutes of the conference do not refer to the timing of the government survey referenced in Paragraph 3.2.3 of the Clearing and Grubbing specifications.  (R4, tab 6; Joint Stip.¶ 11)  USACE did, however, direct Anderson to begin the pre-survey clearing required by Paragraph 3.2.3.  Specifically, USACE's Quality Assurance Report (QAR) for October 7, 2021 states that Anderson was verbally instructed to "[b]egin cutting seepage berm and borrow pit area for survey crew."  (R4, tab 20 at 1)

14.  Anderson performed the clearing for the survey crew on October 12 and 13, 2021.  The QAR for October 12 stated that Anderson began "[b]ush hogging borrow pit and seepage berm locations" and "two men used tractors for bush hogging"[2] (R4, tab 7 at 489; Joint Stip. ¶ 12).  The report also notes that "[s]eepage berm and borrow pit areas were cut for survey crew" (R4, tab 7 at 490; Joint Stip. at ¶ 12).  The QAR for October 13 likewise indicates that Anderson performed bush hogging of the borrow pit and seepage berm locations and cut those areas "for survey crew" (R4, tab 7 at 491-92).  Anderson's daily logs for those dates are consistent with the QARs (app. supp. R4, tab 7 at 12-16).

15.  USACE and EMC considered the clearing Anderson conducted on October 12 and 13, 2021 to be adequate to facilitate the government survey.  On October 14, 2021, the "EMC survey crew [for the USACE] began surveying seepage berm area," according to the QAR for that day (R4, tab 8 at 494; Joint Stip. at ¶ 13).

16.  The next day, October 15, 2021, the "EMC survey crew [for the USACE] continued and concluded surveying seepage berm area," according to that day's QAR (R4, tab 8 at 496; Joint Stip. at ¶ 14).  EMC provided its survey data to USACE on October 20, 2021 (R4, tab 21).  Handwritten survey data dated October 14 and 15, 2021 is attached to the October 15 QAR (R4, tab 8 at 497-511).

---

[2] "Bush hogging" refers to clearing vegetation.  *See Lawn Legends LLC*, ASBCA No. 59078, 16-1 BCA ¶ 36,208 at 176,668 n.1 ("'Bush hogging' or 'brush hogging' is a form of clearing land of brush around trees and rocks using a heavy-duty mowing device called a 'bush hog' or 'brush hog,' which is, generally, attached to the back of a tractor.").  *See also bush hogging,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/bushhog (last visited March 26, 2024) ("to clear of trees and brush.").

17.  On November 9, 2021, USACE provided the survey data and total fill quantity to Anderson.  The data showed the total required fill for the berm was calculated as 76,888 CY.  (R4, tab 9 at 512-14)  Accordingly, by no later than November 9, 2021, Anderson was aware that EMC had conducted the government survey to generate the cross-sections for measuring the amount of fill Anderson placed and knew the quantity resulting from that survey.  Anderson raised no objection to the timing of the survey or its results until more than a year later.

### III.    The Dispute

18.  Anderson completed work on September 12, 2022 (R4, tab 10; Joint Stip. at ¶ 15).

19.  The USACE calculated the total Embankment, Compacted Fill (CLIN 0006) to be 76,888 CY (Joint Stip. at ¶ 16).

20.  On November 2, 2022, USACE's Administrative Contracting Officer sent Anderson a draft modification to the Contract which would, among other things, adjust the quantity of 81,000 CY for CLIN 0006 to 76,888 CY to reflect the USACE's calculation of the total compacted fill placed by Anderson (R4, tab 11 at 522, 524; Joint Stip. at ¶ 17).  Anderson did not sign the modification (R4, tab 11; Joint Stip. at ¶ 18).

21.  In a letter dated December 15, 2022, Anderson noted its objection to USACE's proposed modification as well as USACE's calculation of the final quantity of compacted fill (R4, tab 12; Joint Stip. at ¶ 19).  Referring to Paragraph 3.2.3 of the Clearing and Grubbing specifications, Anderson stated: "[a]s clearly and expressly specified in the Contract, the original cross-sections are to be taken by the Government **after** clearing of the ground surface of all trees, brush and vegetation is completed by the Contractor to within 6-inches of the ground surface" (R4, tab 12 at 526) (emphasis in original).  Anderson contended that the clearing required by Paragraph 3.2.3 had not occurred when the government survey was concluded on October 15, 2021 (*id.* at 527).  Therefore, Anderson stated, USACE failed to take the cross-sections as specified in the contract and "[t]he corresponding calculations computed from the Governments [sic] improperly timed original survey of the embankment area are in error, because they are not representative of the original surface elevations that existed after clearing was performed as required by the Contract" (*id.*).

22.  USACE's Administrative Contracting Officer responded by letter dated December 16, 2022.  The letter references Paragraphs 3.2 and 3.2.3 of the Clearing and Grubbing specifications and 1.3.1 of the Embankment specifications and states:

> The Government agrees that the quantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and in place. The Government also agrees that compacted fill materials of any description will be measured for payment by the cubic yard, and quantities will be determined by the average end area method.

(R4, tab 13 at 529; Joint Stip. at ¶ 20)  The letter concludes that USACE disagrees "that the contract clearly states that Original Surveys taken by the Government should have occurred after Clearing and Grubbing.  The Government didn't need the contractor to 'clear' any debris to conduct Original Surveys.  I believe the surveys and quantity calculated for CLIN 0006 are in compliance with the contract specifications."  (R4, tab 13 at 529)

23.  In a further letter dated January 11, 2023, Anderson again challenged USACE's interpretation of the contract language regarding the timing of the original Government Survey (R4, tab 14; Joint Stip. at ¶ 21).  The letter, referring to Paragraph 3.2.3 of the Clearing and Grubbing specifications, contended:

> The above specification requires and instructs the Contractor and the Government that the stripping removal tolerance of the vegetation is to be 6 inches below the ground surface such that the <u>initial 6 inch lift of suitable embankment material</u> is not placed on top <u>of the existing organic grass and root layer</u> that covered the entire embankment area the Contractor was to place fill on.  Had the Government taken the Original Survey at the proper time, the surface after the 6 inch layer of stripping material (grass & vegetation) was removed would have been captured in the survey.  However, the Government did not take the Original Survey at the correct time during construction activities as required by the Contract.

> The Embankment Base Area comprises 932,007.12 square feet.  The Governments [*sic*] improperly timed Original Survey failed to capture 17,259.39 Cubic Yards of Embankment volume, based on the allowable tolerance of 6 inches below the ground surface that the Contractor actually stripped, then stockpiled and subsequently spread over the completed embankment in compliance with the Contract specifications.

The 17,259.39 Cubic Yards of Embankment volume the Government has failed to include and calculate at $13.00 per Cubic Yard **equates to a $224,372.07 dollar underpayment by the Government** for work the Contractor performed in strict compliance with the Contract requirements.

(R4, tab 14 at 535) (emphasis in original)

24.  By letter dated February 16, 2023, the Contracting Officer denied Anderson's January 11, 2023 request for payment for increased embankment quantities (R4, tab 15).  The letter stated: "[y]our interpretation that the contract quantity computation allows for a 6-inch tolerance below the ground surface is not supported by the language in the contract.  It is clear that the quantity computations are based on the ground line prior to disturbing the ground."  (*Id*.)

25.  By letter dated March 2, 2023, counsel for Anderson requested reconsideration of USACE's interpretation of the contract (R4, tab 16; Joint Stip. ¶ 23).  The letter claimed that Anderson had prepared its bid for the project with the understanding that the contract called for a "clearing of the project site" before USACE conducted the survey to establish the cross-sections that would be used as a baseline in determining the actual amount of fill provided (R4, tab 16 at 540).  The letter goes on to argue that Anderson's interpretation of the contract is reasonable and the contract provisions are ambiguous and should be construed against USACE as the drafter (*id.* at 542).

26.  Anderson submitted a certified claim on March 16, 2023, which generally repeated the contentions made in the March 2, 2023 letter.  Anderson asserted that the government's failure to follow the contract requirements resulted in an undercount of 17,259.39 CY of compacted fill, and thus an underpayment of $224,372.07.  (R4, tab 3 at 1, 3; tab 14 at 535)

27.  USACE's Contracting Officer denied the claim in its entirety by final decision dated May 15, 2023 (R4, tab 2; Joint Stip. ¶ 24).  On June 13, 2023, Anderson timely appealed the claim denial to the Board.

DECISION

## I.     Standard of Review

Board Rule 11 permits parties "to waive a hearing and to submit [their] case upon the record." Unlike a motion for summary judgment, which must be adjudicated on the basis of undisputed facts, when resolving an appeal under Board Rule 11, the Board "may make findings of fact on disputed facts." *Reed Int'l, Inc.*, ASBCA No. 61451 *et al.*, 20-1 BCA ¶ 37,587 at 182,513 (citation omitted).

## II.    The Parties' Contentions

Anderson contends that USACE violated the Contract by performing the government survey before Anderson had completed the clearing operations called for by Section 3.2.3 of the Clearing and Grubbing Specification. Anderson interprets Section 3.2.3 as requiring a pre-survey clearing of all organic material to a depth of 6 inches below the ground surface at the locations specified in Section 3.2.3. In Anderson's view, because USACE's surveying contractor conducted the survey before Anderson had performed this clearing, the resulting cross-sections failed to capture the 6-inch space below the ground surface that Anderson would need to (and allegedly did) fill with compacted fill material. It thus yielded an undercount of the amount of fill Anderson placed, for which Anderson is entitled to compensation. At a minimum, Anderson argues, the Contract is ambiguous and should be construed against USACE as the drafter.

The government disagrees with Anderson's interpretation. The government rejects the notion that Anderson was to remove all organic material to a depth of 6 inches below the ground before the cross-sections were taken. The government reads Section 3.2.3 as providing only for modest clearing to facilitate the government survey, which was satisfactorily accomplished by the "cutting" and "bushhogging" Anderson performed immediately before the survey was taken. Because the government survey was taken as prescribed, the government concludes, USACE properly used the resulting cross-sections in measuring the amount of fill for which Anderson was entitled to payment. To the extent there is any ambiguity, the government contends it was patent, requiring Anderson to raise it with USACE before bidding.

## III.   Contract Interpretation

The issue before us is one of contract interpretation. "Contract interpretation begins with the language of the written agreement." *NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1165-66 (Fed. Cir. 2021) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). "[T]he plain and

unambiguous meaning of a written agreement controls." *Id*. (quoting *Hercules Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002)). We must give the contract "that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *TEG-Paradigm Env't, Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.,* 169 F.3d 747, 752 (Fed.Cir.1999)). We interpret contracts "in a manner that gives meaning to all of its provisions and makes sense," *NOAA Maryland*, 997 F.3d at 1166 (quoting *Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019)), and we seek to "avoid[] conflict or surplusage of [the contract's] provisions." *Id.* (quoting *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997)).

When the contract language is unambiguous, we give it its plain and ordinary meaning and may not look to extrinsic evidence to interpret it. *TEG-Paradigm*, 465 F.3d at 1338. When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may consider extrinsic evidence to resolve the ambiguity. *Id.*; *Jemison & Partners, Inc.*, ASBCA No. 62928, 23-1 BCA ¶ 38,249 at 185,737. The mere fact that the parties disagree as to the meaning of contractual terms does not mean the contract is ambiguous. *Metric Constructors,* 169 F.3d at 751. Rather, both interpretations must fall within a "zone of reasonableness." *Id.*

If an ambiguity exists and is not resolved by consideration of the contract as a whole and extrinsic evidence, then the doctrine of *contra proferentem* comes into play. *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006). Under that doctrine, we resolve ambiguities against the party that drafted the contract. *Id.* An exception to *contra proferentem* applies if the ambiguity is patent, rather than latent. *See States Roofing Corp. v. Winter*, 587 F.3d 1364, 1372 (Fed. Cir. 2009). A patent ambiguity is one that is "obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start." *Id.* (quoting *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (1974)). Where the ambiguity is patent, the non-drafting party has a duty to inquire and a failure to do so will result in the ambiguity being resolved against it. *Id.*

### a. The Plain, Unambiguous Language of the Contract Does Not Support Anderson's Interpretation

Anderson's interpretation of the Contract cannot be squared with the plain and unambiguous language of the Contract. Reading the Contract as a whole and harmonizing all of its parts, the Contract provides that the amount of compacted fill for which Anderson would be paid was to be measured by cross-sections taken via a government survey performed "prior to clearing, grubbing, and vegetation removal operations" (finding 4). To facilitate the taking of the survey, however, the contractor

was required to perform some limited clearing, specifically "clear the baseline traverse, centerline traverse, and ranges at all P.C.'s, P.l.'s, P.T.'s, 100-foot centerline stations and tie-in stations,"[3] under Paragraph 3.2.3 of the Clearing and Grubbing specification (finding 8). While "clearing" is generally defined in Paragraph 3.2.1 of the Clearing and Grubbing specifications, that definition only applies "unless otherwise specified" (finding 7). The term "clearing" is "otherwise specified" in Paragraph 3.2.3 for purposes of the government survey: "the removal to within 6-inches of the ground surface of all trees, brush and vegetation" (finding 8). Reading the provisions together, only the limited clearing described in Paragraph 3.2.3 would occur before the government survey was performed, while the more extensive clearing and grubbing operations provided for in Paragraphs 3.2.1 and 3.3.1 would occur after the survey.

With this out of the way, the principal dispute between the parties centers on the meaning in Paragraph 3.2.3 of "removal to within 6-inches of the ground surface of all trees, brush and vegetation" (*id.*). Anderson asserts that this means removal of all organic material to a depth of 6 inches below the ground surface (app. br. at 11-12, 18). The government interprets it to mean the removal of trees, brush and vegetation only above the ground surface (gov't reply br. at 11-15).

The government's is the more natural reading. A reasonably intelligent person acquainted with the contemporaneous circumstances would not understand the requirement to be to remove all trees, brush and vegetation to a depth of six inches below ground. Rather, the phrase would more commonly be understood as requiring that, after the removal has taken place, any remaining trees, brush or vegetation should be no higher than six inches above the ground. This comports with dictionary definitions of "within." *See within,* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2022), https://www.ahdictionary.com/word/search.html?q=within (last visited March 26, 2024) ("[n]ot exceeding the limits or extent of in distance or time: *got within ten miles of home; stayed within earshot; arrived within two days*.") (emphasis in original); *within,* MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/within (last visited March 21, 2024) ("used as a function word to indicate a specified difference or margin:  came *within* two points of a perfect mark; within a mile of the town") (emphasis in original). For example, a requirement that tree branches be trimmed "to within six inches of the tree trunk" would commonly be understood to mean the resulting limb should be between zero and six inches from the trunk's surface, not that it should be removed to a depth of six inches into the surface of the trunk. Accordingly, we reject Anderson's argument that the requirement to "remov[e] to within 6-inches of the ground surface of all trees, brush and vegetation"

---

[3] The government states that "PC," "PI" and "PT" are abbreviations for the survey terms "point of curvature," "point of intersection" and "point of tangent" (gov't reply br. at 10 n.4).

11

can be reasonably interpreted to mandate the removal of all organic material to a depth of six inches below the ground surface.

At most, the phrase "within 6 inches of the ground surface" could potentially be read to encompass a 12-inch zone ranging from six inches above the ground to six inches below the ground, in the sense that every spot in that range is within six inches of the borderline between the ground and the air. Under this reading, removing everything down to six inches below the ground surface would technically comply with the requirement to "clear" all vegetation to within six inches of the ground surface. This interpretation, however, creates problems in the context of the Contract as a whole.

The language at issue appears in Paragraph 3.2.3, which is a subparagraph under the general heading "Clearing." Paragraph 3.2.1 generally defines "clearing" as the "complete removal *above the ground surface* of all [vegetation and debris]" (finding 7) (emphasis added). Below-ground removal of material is "grubbing," which is covered in Paragraph 3.3 (finding 9). While Paragraph 3.2.3 modifies the definition of "clearing" somewhat for purposes of the specific requirements of that provision, it does not alter the general concept that clearing is an above-ground operation. It would be incongruous to place Paragraph 3.2.3 under "Clearing," and employ only the term "clear," if the intent was to prescribe both "clearing" (removal of above-ground material) and "grubbing" (removal of below-ground material). Thus, while it might be reasonable to read "within 6 inches of the ground surface" in isolation as covering the 12-inch zone from six inches above the ground to six inches below, that reasonableness dissipates when the Contract is considered as a whole.[4]

Perhaps more importantly, even if "within 6 inches of the ground surface" could reasonably be interpreted as covering the 12-inch zone ranging from six inches above the ground to six inches below, that interpretation would not support Anderson's claim. Anderson's fundamental contention is that it was contractually

---

[4] Anderson argues that, under the government's interpretation, the quantity survey to be performed pursuant to paragraph 1.3.1 of the Embankment specification would be redundant with the pre-Contract survey that resulted in the estimate that 81,000 CY of fill would be needed. There is no evidence in the record as to the similarities or differences between the methodologies of the two surveys. It is clear, however, that the later survey was to be taken after some clearing of vegetation. The evidence indicates, moreover, that the surveys yielded different results. *Compare* R4, tab 17 at 546 (pre-Contract survey calculated 72,599 CY) *with* R4, tab 9 at 514 (post-Contract survey calculated 76,888 CY). From this, we conclude that Anderson's redundancy argument is unsupported by the record.

*entitled* to have the government survey taken only after it had removed all organic material to a depth of six inches below the ground surface (*i.e.*, the bottom of the 12-inch zone). Under the 12-inch zone interpretation, however, the government was within its rights to commence the survey when Anderson had cut the vegetation to the top of the 12-inch zone (*i.e.,* six inches above the ground surface), which is what happened (findings 14-16). Anderson's claim depends upon interpreting Paragraph 3.2.3 to *mandate* removal down to the lowest point in the 12-inch zone before the government was permitted to conduct the survey, which we find to be an unreasonable reading.

Anderson asserts that its interpretation is more consistent with the intent of the provisions to accurately measure the amount of fill provided (app. br. at 9, 18; app. resp. br. at 6, 11-13). But Anderson offers no evidence that its interpretation would lead to a more accurate measurement or that the government's interpretation resulted in an inaccurate one. Anderson submitted no affidavits or documentary evidence to support its position that conducting the survey at the time and in the manner USACE did here is inconsistent with arriving at an accurate measurement of the amount of fill placed. Anderson also states that its interpretation is more consistent with "typical construction practice" and "industry standards" (app. br. at 9, 18; app. reply. br. at 2, 14, 18). While it may be appropriate to consider extrinsic evidence of trade practice and custom even when a contract is unambiguous, *TEG-Paradigm*, 465 F.3d at 1338, Anderson has provided no such evidence. Anderson's failure to present any evidence on these points leaves us with no basis to conclude that adopting Anderson's interpretation would better effectuate the parties' intent or reflect trade practice and custom.

### b. The Extrinsic Evidence Does Not Support Anderson's Interpretation

Because the Contract is not ambiguous, there is no need to resort to extrinsic evidence of the parties' intent. To the extent consideration of extrinsic evidence is appropriate, we determine that it does not support Anderson's interpretation of the Contract.

The parties' pre-dispute conduct during contract performance is of great weight in attempting to resolve ambiguous provisions of a contract. *James G. Davis Constr. Corp.*, ASBCA Nos. 58000, 58002,15-1 BCA ¶ 35,818 at 175,158 (citing *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1058 (Fed. Cir. 1983)); *see also Pac. Gas & Elec. Co. v. United States*, 536 F.3d 1282, 1290-91 (Fed. Cir. 2008); *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972) ("[H]ow the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself."); *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1240 (Ct. Cl. 1970) ("The interpretation of a contract

by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight.").

Anderson's conduct during contract performance is inconsistent with the interpretation of the Contract it offers now. At the pre-construction conference on October 7, 2021, USACE directed Anderson to begin cutting the seepage berm and borrow pit areas "for the survey crew" (finding 13). Aware that USACE expected it to perform the clearing required by Paragraph 3.2.3, Anderson bushhogged the site (finding 14). Anderson did not remove all vegetation down to six inches below the ground surface, nor did it object to the survey being conducted before it did so. USACE's contractor, EMC, proceeded with the survey, indicating that USACE considered Anderson's bushhogging to have adequately cleared the area to facilitate the survey. (Findings 15-16) When Anderson learned that the survey had been conducted and its results, which was no more than a few weeks later, Anderson raised no objection or complaint to the survey having been conducted before all organic material had been removed down to six inches below the ground surface. Instead, it completed the work and raised no issue regarding the survey until November 2022. (Finding 17) This course of conduct is strongly indicative that Anderson's contemporaneous understanding of the Contract was the same as the USACE's—*i.e.,* that bushhogging the vegetation so that it was no more than six inches above the ground surface was sufficient to facilitate the survey.

While Anderson repeatedly asserts in its briefs that it held its current interpretation at the time it bid for the contract (app. br. at 8, 10-12, 15, 17, 18; app. reply br. at 16-17), this is solely lawyer argument with no evidentiary support. Under Board Rule 11, Anderson was entitled to offer affidavits or other evidence establishing its contemporaneous understanding of the Contract (and explaining how its pre-dispute conduct was consistent with that understanding or why it was not), but it did not do so. The evidence before us indicates that Anderson's current interpretation differs from its understanding at the relevant time. Accordingly, to the extent the language of the Contract is ambiguous, the extrinsic evidence resolves that ambiguity in favor of the government's interpretation.

The absence of any evidence that Anderson relied on its current interpretation of the Contract when it prepared its bid also defeats Anderson's contention that, if the Contract is ambiguous, it must be construed against the government under the rule of *contra proferentum* because reliance is required for that rule to apply. *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1317-18 (Fed. Cir. 2009) ("[i]n order for a contractor to recover based on an ambiguous contract provision, the contractor must have relied on its interpretation of that provision when preparing its bid.") (quoting *P.R. Burke Co. v. United States,* 277 F.3d 1346, 1355–56 n.3 (Fed.Cir.2002)).

14

We have considered Anderson's additional arguments and find them unpersuasive even if not specifically addressed herein.

CONCLUSION

The appeal is denied. Because Anderson has not demonstrated entitlement, no proceedings relating to quantum are necessary.

Dated: April 17, 2024

THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63632, Appeal of Anderson Contracting, LLC, rendered in conformance with the Board's Charter.

Dated:  April 17, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals